245 F.2d 154
 Eugene BURWELL, Appellant,
v.
Harley O. TEETS, Warden, California State Penitentiary, San Quentin, California, Appellee.
James Alonzo ROGERS, Appellant,
v.
Harley O. TEETS, Warden, California State Penitentiary, San Quentin, California, Appellee.
 No. 15312.
 No. 15313.
 United States Court of Appeals Ninth Circuit.
 May 3, 1957.
 
 R. J. Reynolds, John Adams, Jr., San Francisco, Cal., for appellant Eugene Burwell.
 Walter F. Freitas, S. J. Hugh Allen, San Rafael, Cal., for appellant James Alonzo Rogers.
 Edmund G. Brown, Atty. Gen., Clarence A. Linn, Asst. Atty. Gen., Arlo E. Smith, Deputy Atty. Gen., State of California, for appellee.
 Before POPE, FEE and HAMLEY, Circuit Judges.
 POPE, Circuit Judge.
 
 
 1
 Burwell and Rogers were inmates of the California State Penitentiary at San Quentin. On the evening of January 14, 1952, in what was apparently an effort to escape from the prison, they killed two prison guards and attacked and seriously injured two other guards. They were charged with murder, verdicts of guilty were returned, and death sentences imposed. Upon their mandatory appeals to the Supreme Court of California, they urged among other assignments of error, that upon their trial (they were tried together), they had been denied certain rights under the Constitution of the United States, and thereby had been deprived of due process of law in their conviction.
 
 
 2
 The judgments of conviction were affirmed, People v. Burwell, 44 Cal.2d 16, 279 P.2d 744, and petition for certiorari to review the action of the California Supreme Court was denied, 349 U.S. 936, 75 S.Ct. 788, 99 L.Ed. 1265. The appellants then filed their separate petitions for writs of habeas corpus in the court below making the same allegations of denial of constitutional rights which had been specified in their previous appeals to the California Supreme Court. Orders to show cause were issued directed to the appellee as respondent, and both made returnable at the same time. The executions of the petitioners were stayed. The respondent made return and both petitions and the returns thereon were heard together. The court below had before it the entire record of the proceedings in the trial court where the petitioners were tried, as well as the briefs and the petitions for rehearing in the Supreme Court of California, and the petitions for certiorari.
 
 
 3
 No evidence aside from the record in the State courts was offered or received. Petitioners were represented by the same court-appointed counsel who had represented them in the State courts. At the conclusion of the hearing the orders to show cause were discharged and the petitions for writs of habeas corpus were denied. Petitions for certificate of probable cause were denied by the trial court but were granted by a Judge of this court. Application of Burwell, 9 Cir., 236 F.2d 770.
 
 
 4
 The applications for writs of habeas corpus alleged denial of fair trials and want of due process in a number of respects. The particulars of such claimed denials of constitutional right we proceed to discuss, beginning with the contentions made by appellant Burwell, and thereafter dealing with Rogers' appeal.
 
 
 5
 Burwell's Appeal.
 
 
 6
 The question which presents the most difficulty here has to do with the use of confessions made by Burwell under circumstances which the appellants assert amount to coercion. This question was presented and tried in the State trial court. The circumstances under which the confessions were made were fully developed in the trial court. The judge made the preliminary inquiry as to the voluntariness of the confessions prior to permitting them to be received in evidence. The evidence as to these circumstances was presented to the jury and the question whether the confessions were voluntary or not was submitted to the jury under appropriate instructions with which appellants find no fault.
 
 
 7
 It was upon this record that the district court made its determination; the same record which was before the State Supreme Court. No effort was made in the court below to introduce any other evidence. The State courts have at every stage found against the appellants with respect to their claim of coerced confessions. Since all permissible findings of fact have been resolved against them, they concede here that such claim must be based upon those facts in the case which are undisputed.[1]
 
 
 8
 On January 14, 1952, the day of the killing, Burwell, a man in his late twenties, was serving a term for the crime of robbery. He had entered the prison February 21, 1948, and had been notified by the prison authorities that he was scheduled for parole just 38 days later, on the anniversary of his entry. His record in the prison was that of a model prisoner. He had been given a position as chief clerk in the prison library where he was allowed to come and go as he pleased, and the reports of his work in that capacity indicated that he was both intelligent and hard working. He showed ability in typing, record keeping, and other paper work. He was described as a prisoner of pleasing personality, and as a conscientious and dependable clerk. He was an honorably discharged veteran of World War II; he had landed with the American Expeditionary Forces in Normandy; he had served in four theatres of that War and won citations for bravery, including four Bronze Stars. Customarily, and of his own choice, he worked long hours in the library, and on the evening of January 14 he was still there at 6:30 or 7 P. M. At the same time Rogers was also in the library where he was not supposed to be. There was some dispute as to why Rogers had gone to the library; but while he was there, one Wiget, a prison guard, came to the library in making his rounds of inspection. A fight occurred between the guard and Burwell and Rogers and the guard was killed.
 
 
 9
 There was much conflict in the evidence as to who started the fight and as to whether it had some connection with previous "racial" disputes between Burwell and the guard. (Burwell is a negro). During the fight Burwell was stabbed in the back with a knife, and also received a superficial wound on the thigh. The knife thrust in his back was just below the right shoulder blade. The wound started to bleed but Rogers used a first aid kit and closed the wound and stopped the bleeding. Two other prison guards came into the library and were attacked by Burwell and Rogers using a hand ax and scissor blades. Both officers were severely cut and beaten into unconsciousness. After some time the two prisoners made their way into a projection booth which overlooked a mess hall where a basketball game was in progress. Apparently they succeeded in gaining access by telling a guard, Officer Mackin, who was in charge of the projection room, and an inmate who was playing records there, that they had been sent to pick up some phonograph records for the library. When they saw that Officer Mackin noticed the blood on Burwell and was about to telephone, they attacked him. The other inmate ran from the room and gave an alarm, but before guards could be summoned Mackin was stabbed in the heart. He was later found to have numerous scalp wounds inflicted by the hatchet which Burwell had carried.
 
 
 10
 The first persons who entered the projection booth after the alarm was given were an army sergeant and a prison guard. Mackin was found dead lying in a pool of blood. The army sergeant had been in charge of a group of soldiers from the Presidio who had come over to play against the prison basketball team. Referring to Burwell he testified that his clothes were covered with blood; that he seemed ashen, "like a person who is a little faintish." Burwell asked if he could sit down and the sergeant told him to do so and he sat on an ice cream can outside the door of the projection room. For some reason, which is not apparent, no other guards or prison officers came to the projection room for a full half hour. The sergeant had testified that he reached the projection booth about 8:30 P. M., and left at 9 P. M. in order to accompany the soldiers composing his team back to San Francisco. He left the single prison guard with Burwell and Rogers.
 
 
 11
 Some minutes after the sergeant left, Captain Nelson, with a group of other prison officers, arrived. Burwell and Rogers were ordered to strip off their clothes and they were marched across an open prison courtyard into Captain Nelson's office. On the way across the courtyard Burwell lagged behind and was told to quicken his pace. When he replied that he was in no hurry, one of the guards twisted his arm behind his back to hurry him and another struck him across the back and buttocks to speed him along. As this occurred some armed guards on the wall shouted, "Stand aside and we will shoot the `so and sos'". The Captain, who was with the prisoners, promptly rebuked the guards and said that no one would hurt the prisoners and that they were to be taken through safely.
 
 
 12
 As Burwell was led into the Captain's office, he stumbled and fell headlong. He was taken to the adjoining associate warden's office and was questioned by a Captain Thompson. The latter stated that the questioning began at some time between 9:15 and 9:30. As he was questioned Burwell stood naked in front of the desk at which Thompson was seated. Thompson testified that Burwell appeared to be in a weakened condition and frightened and pale; it was apparent that he had been bleeding for there was dried blood on his back. As soon as Captain Thompson began by asking Burwell what had happened, the latter at once undertook to tell him. With no hesitation he told Thompson that he had had some trouble with Officer Wiget; that he and the officer had words when the officer first came into the library; they started to fight; he got the knife away from the officer and struck the officer with the knife at least four times. He told how he and Rogers got to the projection room; that the officer who let him into the projection booth saw blood on his clothes; that he hit the officer with a hatchet — hit him several times. He said to Capt. Thompson, "Why go through with this; I killed the guy, why not leave the other guy alone?"[2]
 
 
 13
 The District Attorney of the county then arrived and he questioned Burwell. This began about 10 P. M. and continued some twenty or thirty minutes during which Rogers was not present. Then Rogers was interrogated separately and apart from Burwell by the attorney. Thereafter Burwell was questioned by the attorney again. All this time he had been standing. He then asked to sit down saying he was tired. He was permitted to sit on a chair while the questioning continued. He then became ill, started retching and vomiting; his wound opened and blood began flowing from the wound in his back and the questioning was immediately stopped; the prison physician was called to bandage his wounds and he was then taken to the prison hospital.
 
 
 14
 The questioning terminated at 11:35 P. M., according to Captain Thompson's notes. This witness' testimony was that after Burwell's questioning by the District Attorney began at 10 P. M. there was a half hour interval during which Rogers was being questioned. Thus the interrogation of Burwell, both before and after the questioning of Rogers, covered a total period of approximately one hour. It was about 15 minutes before he finally collapsed that he asked permission to sit down and a chair was furnished him. The statement which he made to the District Attorney in response to the latter's questions did not differ in any important particular from those previously given to Thompson except that he furnished more details as to what happened in the projection booth. Here again, as soon as the District Attorney started inquiring by asking: "When did this start?" Burwell promptly, and without hesitation, told about the killings, and his part in them. He indicated that the struggle which followed with Wiget when the latter entered the library had stemmed from a quarrel which Burwell had with that officer a week previously when they had words over a "racial matter".
 
 
 15
 Initially we consider the question of the propriety of the receipt in evidence of these two oral confessions made in response to questioning by Officer Thompson and the District Attorney.[3]
 
 
 16
 In an attempt to come to a conclusion as to whether Burwell's confessions were coerced, we note that no answer to the question can be found through an inquiry as to whether the prison authorities were justified in stripping the prisoners of their clothing and marching them naked across the prison yard to the captain's office. The California Supreme Court referred to the circumstances relating to the force that was used to bring the two prisoners to the captain's office. It mentioned the fact that there were 250 inmates in the vicinity of the area through which these men were marched, and that the officers were concerned whether the violence by Burwell and Rogers was part of a planned general prison break and they were not certain how the other prisoners would react to their apprehension. The removal of the clothing was a reasonable precaution for it appeared that Rogers still had a knife in his belt when he was required to disrobe and it was plain that the clothes might be required as evidence.
 
 
 17
 But the question still remains whether under the circumstances Burwell's confession was a voluntary one. For no matter how justified these means may have been, yet his condition may have been such as to make a voluntary statement impossible. Unquestionably as Burwell stood before the desk in the associate warden's office when Capt. Thompson began to question him around 9:15 that evening he was in a seriously weakened physical condition. At least two hours earlier he had been stabbed in the back with a knife that punctured his lung; the lung was partially collapsed, and the lung cavity was full of blood, although the bleeding at the point of the knife wound had been stopped by the bandage which Rogers had applied. He was described by those who saw him both when he was taken at the projection room and as he stood and answered questions as appearing pale, tired and frightened. Undoubtedly his naked condition added to his sense of defenselessness.
 
 
 18
 There is no indication that any physical force or threat of force was an inducement to the making of Burwell's statements. The shouted threats of the guards on the wall had been promptly rebuked by Capt. Nelson who stated that no one was to hurt these men and that they were to be taken through safely. They had reached the office safely and we think it cannot fairly be believed that the force used to hurry Burwell along operated as an inducement to the statement made after he reached the Captain's quarters. If there was coercion here, it would have to be psychological coercion through a process of interrogation at a time when Burwell was so weakened that he lost the power to resist a demand for a confession.
 
 
 19
 In speaking of psychological coercion, Mr. Justice Jackson in Stein v. People of State of New York, 346 U.S. 156, 185, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522, said: "The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal."
 
 
 20
 As stated by Mr. Justice Frankfurter in Watts v. State of Indiana, 338 U.S. 49, 53, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801: "When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal."
 
 
 21
 A recent case in which the conviction of a state prisoner was set aside because of the use of a confession held to have been procured through psychological coercion is Fikes v. State of Alabama, 352 U.S. 191, 198, 77 S.Ct. 281, 285, 1 L.Ed. 2d 246, where the court held: "* * * that the circumstances of pressure applied against the power of resistance of this petitioner, who cannot be deemed other than weak of will or mind, deprived him of due process of law."
 
 
 22
 It is noteworthy here that the statements made by Burwell to Thompson and to the District Attorney differed from those considered in the Fikes or Watts cases in that the moment Burwell was asked as to what happened he immediately told the whole story and without hesitation or need for urging. In the Fikes case, the ignorant, thick-headed, and possibly partially insane Negro, was interrogated for long hours and on successive days while he was kept out of contact with all other persons; — the interrogation began on Sunday and the first confession occurred on Thursday evening; questioning was again resumed and carried over into the second week when he made a further confession. In the case of Watts, the prisoner was questioned by officers in relays, for the most part through long night sessions, through Wednesday, Thursday, Friday, Saturday and the following Monday and Tuesday, and finally the prisoner, at the end of continuous questioning from 6 o'clock the previous evening until 3 o'clock in the morning, made an incriminating statement.3a
 
 
 23
 "Interrogation is not inherently coercive, as is physical violence." Stein v. People of State of New York, supra, 346 U.S. at page 184, 73 S.Ct. at page 1092. When physical violence or threat of it is shown, "there is no need to weigh or measure its effects on the will of the individual victim. * * * [J]udges long ago found it necessary to guard against miscarriages of justice by treating any confession made concurrently with torture, or threat of brutality as too untrustworthy to be received as evidence of guilt." Stein v. People of State of New York, supra, 346 U.S. at page 182, 73 S. Ct. at page 1091.
 
 
 24
 When Capt. Thompson began asking questions of Burwell that evening he was not in the mere asking of the questions depriving Burwell of any constitutional or other right. Burwell's answers were not inadmissible in evidence, and the receipt of those answers in evidence was not a denial of due process unless it can be said that the answers were extorted. The use of such a confession becomes a denial of due process only if the prisoner speaks "because he is overborne", or if the confession is "the product of sustained pressure by the police." Watts v. State of Indiana, 338 U.S. at page 53, 69 S.Ct. at page 1350.
 
 
 25
 It is not shown that Burwell did not understand the questions or know or appreciate what he was saying. He was faint and weak, but the indications are that his mind was under the circumstances surprisingly clear.[4] As the prison physician testified, he found when called that evening after Burwell became ill, that his blood pressure and respiration were normal and his pulse nearly so. The record indicates that Burwell was a man of more than ordinary intelligence, and that one of the motives which the officers had in questioning him was their natural curiosity as to what could have caused a man with Burwell's excellent prison record, who held a responsible position in the prison, a near trusty, and who was shortly to be released on parole, to engage in a series of violent acts such as he had just done.[5]
 
 
 26
 Nor does it appear that Burwell was responding to any pressure when he confessed. Thompson simply said to him, "How did this happen?" and Burwell promptly told him. Unlike the situations described in Fikes v. State of Alabama and Watts v. State of Indiana, supra, the circumstances attending Burwell's statements to the officer and the District Attorney were like those in Stroble v. State of California, 343 U.S. 181, 191, 72 S.Ct. 599, 604, 96 L.Ed. 872: "In the District Attorney's office, petitioner answered questions readily; there was none of the `pressure of unrelenting interrogation' which this Court condemned in Watts v. [State of] Indiana, 1949, 338 U.S. 49, 54, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801."
 
 
 27
 For the purposes of this decision we assume that we are in no manner bound by the determinations of the due process questions in the State courts.[6] The record here convinces us that the statements made by Burwell were neither coerced nor involuntary. It is true that when he made his first statement to Officer Thompson and to the District Attorney Burwell was sorely wounded, weak and exhausted. As he stood naked before the questioning officers it must be taken for granted that he had a feeling of helplessness. But there is no evidence to suggest that Burwell did not understand what he was saying or that he lacked the strength to determine whether he would or would not talk. The questions asked of him were proper and his answers prompt, coherent and responsive. There is no evidence that the statements were received "through pressure of unrelenting interrogation", or that Burwell spoke because he was "overborne", or because he was being subjected to a "mental ordeal".
 
 
 28
 If a prisoner is caught red-handed in a commission of a crime it must be assumed that he is then in a condition of acute mental distress; and that distress would not be lessened if he was suffering from wounds received during a crime of violence. At that moment his fondest wish, his most urgent desire would be that he were a thousand miles away. Surely he would not of his own motion choose to stand where he was and be questioned, he would not volunteer to come forward with a statement, when he no doubt miserably wished it were all a bad dream.[7] But that does not make his answers to questions involuntary or coerced in the legal sense.
 
 
 29
 We need not determine whether, considering the extent of Burwell's injuries and the circumstances of his apprehension, it would have been improper for the authorities to insist over his objection that he make a statement, for that was not this case. Here Burwell, apparently in substantial command of his faculties, made a full statement in response to the first suggestion of a question. We cannot hold that the receipt in evidence of Burwell's confession on the night of the crime was a denial of due process of law.
 
 
 30
 With regard to the later confessions of Burwell, (footnote 3, supra), it has been argued that they were coerced also. It appears that the prison doctor talked to Burwell shortly before noon on the following day in his hospital room. He was in bed. The doctor described his condition as being one of mental alertness. Burwell "was very cooperative and answered everything we asked." When the doctor treated Burwell the previous evening he had been given codeine to relieve his cough, and when he was hospitalized he was given an injection of morphine. The doctor's testimony was that the effects of the codeine and morphine had worn off long before his visit on the morning of January 15. On this occasion Burwell gave a running account of what had happened on the preceding day. By that time the doctor knew the extent of Burwell's injuries; he had a partially collapsed lung, a minor puncture wound in the left thigh, and there was blood and air in the chest cavity. However the prisoner was resting comfortably. Although the statement made to the doctor was in more detail and at somewhat greater length than that made to Thompson or to the District Attorney on the preceding evening, the substance of it was no different.
 
 
 31
 On the afternoon of the same day, January 15, Burwell was again questioned by the District Attorney in his hospital room and his answers were taken down by a shorthand reporter.7Â½ The District Attorney began by asking, "Do you have anything to say for yourself?" to which Burwell replied, "No, everything I said last night still stands." Aside from making a change in the story as to whether he got the hatchet before or after Wiget entered the library, the account of Burwell that afternoon not only confirmed what he had said before but it indicated that Burwell was fully aware of what he had said the previous evening.
 
 
 32
 It is clear that the statements in the hospital room were not coerced. The evidence indicates that Burwell's mind was clear and that he spoke freely and with an apparent attitude of cooperation. Of course, when an earlier confession has been coerced and a later one cannot be separated from the earlier one, and is but a continuation and still the product of the earlier coercion, the later confession may not be used whether the first is excluded or not. Cf. Leyra v. Denno, supra. Since we have determined the first confessions were voluntary, it is unnecessary to consider whether the later ones were "parts of one continuous process." It is plain, however, that the later statements were as clearly separated as were the earlier and later confessions in Lyons v. State of Oklahoma, 322 U.S. 596, 604, 64 S.Ct. 1208, 88 L. Ed. 1481. They cannot be deemed parts of a continuous process beginning the night before. Indeed, if these confessions show anything, they indicate that Burwell was anxious to relieve himself by full statements and that such state of mind was probably present when he made his statement to Thompson the night before.[8] His state of mind was similar to that described by the Supreme Court in Stroble v. State of California, 343 U.S. 181, 191, 72 S.Ct. 599, 604, 96 L.Ed. 872: "Indeed, the record shows that from the time of his arrest until the time of his trial, petitioner was anxious to confess to anybody who would listen — and as much so after he had consulted with counsel as before. His willingness to confess to the doctors who examined him, after he had been arraigned and counsel had been appointed, and in circumstances free of coercion, suggests strongly that petitioner had concluded, quite independently of any duress by the police, `that it was wise to make a clean breast of his guilt.'"
 
 
 33
 We hold there was no denial of due process in the admission of any of these confessions.
 
 Rogers' Appeal
 
 34
 The remaining specifications of error are relied upon by both appellants, but since they are most fully discussed in appellant Rogers' brief, we deal with them in connection with our consideration of his appeal. These additional assignments relate to conduct on the part of the State and its prosecuting officers which appellants say operated to deny their counsel a fair opportunity to present their defense and which otherwise surrounded the appellants with conditions which made a fair trial impossible.
 
 
 35
 When counsel were appointed to represent the two defendants, they found it impossible to secure desired interviews with petitentiary personnel. They went to the office of the county coroner which they reached late in the day and asked to look at the coroner's files. The District Attorney was called; he gave consent to their perusal, and defense counsel glanced at this material; but since it was then 5 P. M. and closing time, they made arrangements to return the following morning and study the data in the file more fully. Before counsel could return the following day, the District Attorney had removed from the coroner's file all of the material that had been there the preceding evening with the exception of the coroner's report, an autopsy report and a personnel report. Counsel for the two defendants then made the efforts hereafter described to procure an inspection of these materials, but with minor exceptions later noted, they were unsuccessful.
 
 
 36
 It is claimed that in consequence of the conduct of the prosecution above noted, and the manner in which the State resisted and delayed appellants' efforts to obtain these materials, the accused were denied a fair opportunity to prepare for trial. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, demonstrates that when the prosecutor in a state court is guilty of such unfair, dishonest or ignoble conduct as to prevent a fair trial for a defendant, then the accused has been denied the due process called for by the Fourteenth Amendment. The question is did the prosecutor's acts in withdrawing these materials from the coroner's possession and in otherwise seeing to it that counsel for appellants had no opportunity to inspect them, amount to a denial of due process within that rule.
 
 
 37
 These materials were of two kinds. The greater portion were written statements made by officers or employees within the prison concerning their observations of the happenings at the time of these killings. The others were copies of statements, in question and answer form, taken from the two prisoners.[9] The papers came into the hands of the coroner in the following manner: Upon learning of the deaths of Wiget and Mackin, the coroner went to the Warden and made certain inquiries in connection with his determination as to whether an inquest should be held. He then asked the Warden if he might have copies of these statements. The Warden agreed to this on the condition and with the understanding that they should be kept by the coroner and the contents not released without the consent of either the Warden or the District Attorney.[10]
 
 
 38
 The statements of the prison employees, which are the documents concerning which appellants now complain, were not in themselves evidence.[11] Had they never come into the hands of the coroner the accused persons would have had no right to inspect them, for they were the sort of notes or memoranda which are normally a part of the prosecutor's files, or the files of those in-investigating for the prosecutor, which the defense has no absolute right to inspect. See Goldman v. United States, 316 U.S. 129, 132, 62 S.Ct. 993, 86 L.Ed. 1322; People ex rel. Lemon v. Supreme Court, 245 N.Y. 24, 156 N.E. 84, 52 A.L. R. 200 (cited in Edwards v. United States, 312 U.S. 481, 61 S.Ct. 674, 85 L. Ed. 963); United States v. Lebron, 2 Cir., 222 F.2d 531, 535 to 536.[12]
 
 
 39
 Appellants argue that since these documents were in the hands of the coroner and in his file, they became public documents within the meaning of § 1227, Government Code of California, which provides that public records in the office of any officer are at all times open to inspection of any citizen of the State.[13] Whether or not these documents were public records within the meaning of the California statute, or records which, under the law of California were open to inspection by persons in the position of these appellants, is the crucial question here. If they were not, the mere fact that counsel had a windfall in the way of a momentary look at them, before the District Attorney decided to withdraw his consent, did not create a right of further inspection.
 
 
 40
 The appellants, for their part, made every effort to obtain an inspection of these materials and to obtain from the California courts a decision upon this controlling question of local law: were these public records? After failing to procure an order for their inspection in the criminal case, they brought mandamus proceedings in the local superior court against both the coroner and the District Attorney to compel inspection. The court issued the peremptory writ requiring inspection of the statements of Rogers and Burwell but denied any further relief. Both sides appealed to the District Court of Appeal. As the time for trial of the criminal case approached, the judge notified the District Attorney that unless the documents which had been ordered delivered were furnished, the trial would be postponed. Thereupon their own statements were supplied to appellants. However the appellants' appeal in the District Court of Appeal was not reached before the criminal trial, and thereafter the appeal was dismissed by that court as moot. Upon the mandatory appeal to the State Supreme Court it was stipulated that the record in the mandamus case should be part of the record on that appeal. It was urged there, as it is here, that appellants had been entitled to inspect those documents as public records.
 
 
 41
 The Supreme Court did not expressly pass upon this question. Since it appeared that appellants, after their trial and before presenting their motion for new trial, had obtained access to all these materials, that Court held that they had failed, on their motion for new trial and on their appeal to show any prejudice had resulted from their lack of access before trial. The Court said: "Assuming that this question is still open on this appeal it is clear that the defendants must show more than a bare right to have had access to the additional material in the coroner's file prior to the commencement of the trial. They must show on this appeal that withholding the material resulted to their prejudice or that earlier access to the material would have been of some advantage to them. They were granted access to it prior to the motions for a new trial and neither there nor here have they shown that the claimed wrongful withholding of information was to their disadvantage either as a denial of a fundamental right resulting in an unfair trial, or as a miscarriage of justice." People v. Burwell, 44 Cal.2d 16, 279 P.2d 744, 749, 750.
 
 
 42
 We are compelled to disagree with this treatment of the problem. If these appellants were in fact denied a fair opportunity to prepare for trial by an improper and unlawful extraction by the District Attorney of public records which appellants had the right to see, it is no answer to say they have not demonstrated what use they could have made of them. That is beside the point. The point is that as a part of due process they had the right to try. In the nature of the case they cannot now demonstrate that if they had known of all these witnesses and could have interviewed them, useful information would have been received. The situation is the same as that present in Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 629, 1 L.Ed. 2d 639: "The circumstances of this case demonstrate that John Doe's possible testimony was highly relevant and might have been helpful to the defense. * * * The desirability of calling John Doe as a witness, or at least interviewing him in preparation for trial, was a matter for the accused rather than the Government to decide."[14]
 
 
 43
 We are thus confronted with a situation that so far as we are aware is without precedent. Plainly the California Court might well have decided this question of local law and have held these materials not public records open to inspection. Such a decision would have disposed of the matter. It failed to reach that decision because of its mistaken view that appellants were required to show just how they were prejudiced. The inquiry is, was not the failure of the State Supreme Court to pass on this question of local law itself a denial of due process?[15]
 
 
 44
 Recent decisions of the Supreme Court have made it clear that in some circumstances the denial to an accused of an opportunity to have a decision by the State Supreme Court upon a question of state law may itself be a denial of due process. Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891; and compare Chessman v. Teets, 350 U.S. 3, 76 S.Ct. 34, 100 L. Ed. 4.[16]
 
 
 45
 The inquiry thus presented is not an easy one. In resolving it we hold that we are not justified in finding a want of due process in the respect here suggested for it cannot be said that these documents were, under the circumstances here present, public records which appellants were entitled to inspect. Wholly apart from the question of whether they were within the rule relating to confidential papers, we are of the opinion that the mere fact that the coroner was permitted to take these papers to his office did not make them any more public records of his office than if he had examined and read them without removing them from the Warden's office or had gone to the District Attorney's office to read them. No statute provided for his procuring or filing such matters. He filed his report as required by law,[17] and it remained on file and available for inspection. We do not suggest that public records, in the sense here used, may not include documents not expressly required by statute to be filed. What we say here is that we cannot believe that these materials received by the coroner in this informal manner, on conditional loan, as it were, from the Warden, would be held by the California court to be public records required to be held for general inspection, or for inspection by these appellants. In concluding its discussion of this matter, the State Supreme Court said: "The constitutional guaranties and prohibitions are not such as to require pretrial cooperation in a criminal case." That statement would be wholly without meaning if that court regarded such material as public records. It is a clear indication that it did not so regard them.
 
 
 46
 It is contended that appellants were denied a fair trial because of the manner in which an armed guard was stationed just outside the courtroom while the trial was going on. It appears that there was a side door to the courtroom located just three or four feet behind the witness stand from which both defendants gave their testimony. It opened into an anteroom which in turn led into a hallway. An armed guard was stationed in that anteroom during the trial, and he there stood or sat within a distance of some eight or nine feet from the witnesses on the stand. During the time when Burwell or Rogers was testifying he held a loaded revolver in his hand. He was not in view of the jury and he could not be seen from the jury box but the attorneys at the counsel table could see him. Burwell's affidavit, filed in support of his motion for a new trial, stated that when he was called upon to step to a blackboard on several occasions to illustrate his testimony, he could see the guard and saw that the gun was pointed in his general direction. Knowing the guard was there, he says, made him tense and nervous, and impaired his ability to manifest the best possible demeanor and bearing while testifying. Presumably the trial judge had some idea as to whether the guard was in fact visible to Burwell or Rogers. Perhaps his observations as to the location of the guard and as to Burwell's demeanor led him to an opposite conclusion; or he simply may have disbelieved the affidavit. He did not say for he made no finding as to this when he denied a new trial.[18]
 
 
 47
 In inquiring whether this use of an armed guard operated as a denial of due process some additional facts must be noted. While Burwell was awaiting trial he attempted to send letters out of prison seeking assistance to permit him and Rogers to escape from the courtroom during their trial through the use of guns to be smuggled into the courtroom by outside confederates. These letters, which Burwell admittedly wrote, were intercepted by the prison officials; they were called to the attention of the court, and were introduced in evidence.
 
 
 48
 Assuming the facts as to the guard were exactly as claimed by appellants, it is too plain for argument that a prisoner who plans to shoot his way out of the courtroom is hardly in a position to complain about an armed guard stationed outside the courtroom at the place where escape would most likely be attempted. We are of the opinion that no more safeguards were employed than were reasonably required in view of Burwell's own conduct. Both appellants complain that they were taken to and from the courthouse in chains, and that persons about the courthouse, including some of the jurors, could see this. At these times it appears that the prisoners were handcuffed to their belts, and these were secured by chains underneath their clothing. They were not handcuffed or in chains in the court room. This complaint, like that about the armed guard, is directed at security measures reasonably caused by Burwell's own conduct. The case here is like that of Odell v. Hudspeth, 10 Cir., 189 F.2d 300, certiorari denied 342 U.S. 873, 72 S.Ct. 116, 96 L.Ed. 656. We find no merit in the claim of denial of due process in these respects.
 
 
 49
 Appellants argue that a fair trial was denied because the court did not keep the jury together at all times, but allowed them to separate at recesses and adjournments, so that they had an opportunity to mingle with the spectators during these times. In dealing with this contention the California Supreme Court held (a) that the record did not show that any objection to this procedure was made by counsel for defendants, (b) that the court gave adequate admonitions to the jury, in full compliance with the State statute and under those circumstances to permit the jury to separate was within the discretion of the trial court, and (c) that when the objection was made on motion for new trial the affidavits then presented showed no discussion between jurors and others, and no prejudice was shown. We hold this contention without merit. See Odell v. Hudspeth, supra.
 
 
 50
 Another reason why appellants say they were denied a fair trial is the asserted misconduct of the prosecutors. This included, it is said, the giving of testimony at the trial by both the District Attorney and his Deputy; the attempt of the District Attorney to exclude from evidence Burwell's shirt (it was received in evidence); the failure of the prosecution to procure or produce scientific tests of some of the physical evidence; attempts to introduce certain photographs (which were in fact excluded); persistence in asking leading questions; and intemperate statements in arguments to the jury. These matters are discussed in the opinion of the California Supreme Court, 44 Cal.2d 16, 279 P.2d 744. We can find no fault with what that Court said about these matters. As there indicated, on many of these points the trial court ruled with the defendants. Where it did not, the holding of the California court that the conduct complained of was not prejudicial cannot be said to be so wide of the mark as to amount to a denial of constitutional due process.
 
 
 51
 It is asserted that not only Burwell, but both appellants were denied due process and equal protection of the law because Negroes were excluded from the grand jury which indicted them by reason of a purposeful and systematic exclusion of Negroes from such juries in this county. This contention was fully discussed in the opinion of the State Supreme Court. As there disclosed, there is no foundation in fact for this claim.
 
 
 52
 Finally, appellants make a general charge in these words: "The conduct of the over-zealous prosecutors throughout the trial, and all pre-trial and post-trial proceedings was so reprehensible as to have deprived appellant of the fair trial guaranteed to him by the due process clause of the Fourteenth Amendment to the Constitution of the United States." We assume that what appellants are here saying is that even if, considered singly, the various items of alleged irregularities could be justified, yet taken in the aggregate they added up to a denial of due process.
 
 
 53
 What we have said heretofore sufficiently discloses why we think that, taken as a whole, the record fails to show a denial of due process.
 
 
 54
 The orders denying writs of habeas corpus are affirmed.
 
 
 
 Notes:
 
 
 [1]
 Cf. Leyra v. Denno, 347 U.S. 556, 558, 74 S.Ct. 716, 717, 98 L.Ed. 948: "We therefore examine the circumstances as shown by the undisputed facts of this case."
 
 
 [2]
 Officer Thompson's account of the statements made by Burwell was as follows:
 "Q. What was said? * * * A. I asked him what happened that night, and he said just a little flare-up; I asked him where he worked, and he said `In the library', and he worked there at nights, and I asked him what the trouble was and he said he was having a little trouble with one of the officers for about a week and came into check up on him — Officer Wiget came in to check up on him, and they had a few words. He said he jumped the officer and the officer struck him, and they were on the floor, and he got the knife away from the officer and he also told me he stuck the officer at least four times, twice in the front and twice in the back, and he said he had broken the knife off in the officer and he said he had gone to the projection room shortly after that and had reach the projection room by going through the new mess hall, passing through the basketball game, through the kitchen, and got the officer to let them in the projection booth, and asked him if the officer saw any blood on him, and he said yes, as he was opening the door he saw blood on my clothes. * * *"
 "He said he saw blood on his clothes after he let him in, and I hit him with a hammer, and I questioned him about it being a hammer and he said half hammer and half hachet — half axe, and that he hit him several times with that. That's about the extent of it. There is one thing that isn't in my notes that comes to my mind, a remark he made without any questioning during my interrogation, that, why go through with this? I killed the guy. Why not leave the other guy alone?"
 "I asked him, `What made you do what you did?' And he told me he had a flare-up with the officer and he blew his top and jumped the officer, and he said he took the knife from the officer and stuck him, and I asked him where he got the knife, and he said `Off Mr. Spector's desk.'"
 "He said he had gotten it off Mr. Spector's desk, and after he stabbed the officer he dragged the body into the back room. That's what took place in the library."
 
 
 [3]
 There were two additional statements made the next day by Burwell and they were received as further confessions. One was made shortly before noon to the prison physician and the prison psychiatrist, and the other was made in the afternoon to the District Attorney in the presence of the associate warden. This later statement was taken down in shorthand by a court reporter. The circumstances under which each of those later statements were taken will be discussed later herein
 3a. In Chambers v. State of Florida, 309 U.S. 227, 60 S.Ct. 472, 474, 84 L.Ed. 716, "five days of continued questioning had elicited no confession."
 
 
 [4]
 Aside from his own testimony at the trial, (which the court and the jury were not obliged to accept), the evidence most favorable to Burwell in this connection is found in his statement made the next afternoon to the District Attorney. At that time Burwell was being questioned as to his present statement that Wiget did the first stabbing, and the District Attorney asked if he had not stated the contrary the preceding evening. Burwell's statement, (then being taken in shorthand), proceeded:
 "A. There would be some discrepancy in what I said last night, and what I said today. Last night I was on the border line. It seemed like I could hear you and Captain Nelson and some others in one ear but I couldn't see you well.
 "Q. Last night you don't — you didn't have any time to make up any story, did you?
 "A. Last night I didn't have time to think about anything. That doesn't nullify the truth of what I am saying now. I think I have answered all questions pretty truthfully.
 "Q. Last night —
 "A. In fact, if you, yourself, thought over what I said last night, there would be very little reason for your presence now."
 The final sentence, just quoted, is interesting. Also interesting is the fact that in the discussion of a possible discrepancy between what Burwell was now saying and what he had said the night before as to who stabbed first, Burwell's recollection of what was said before was clear and correct. His story the night before was exactly the same as it was now. (See footnote 2, supra, for the statement to Thompson. He said the same thing to the District Attorney that same evening.) During this questioning, when, as later indicated, Burwell was in bed but resting easily, he plainly thought he remembered just what he had said for his first answer was: "No, everything I said last night still stands." The whole tenor of this questioning, which in the main was a going over with Burwell of what he had said the previous evening, indicates that he then clearly remembered the earlier statement. This remembrance is evidence of mental capacity when the earlier statement was taken.
 The doctor's written diagnosis at the time of Burwell's examination the night before was: "Pneumo thorax, punctured right lung, sufficiently oriented, mentally clear, and examination showed no drug or alcoholic intoxication."
 
 
 [5]
 The violent action against Wiget by Burwell at a time when he was soon to be released on parole does not necessarily demonstrate any lack of mental capacity. According to his later statement, the "racial matters" which provoked the fight, and which seemingly had started a week earlier, included terms used by Wiget among which were "a few mentions of color, sons of bitches, and the usual term of nigger and so forth", — the sort of thing likely to produce resentment in proportion to the intelligence of the listener
 
 
 [6]
 "In exercising the power thus bestowed, the District Judge must take due account of the proceedings that are challenged by the application for a writ. All that has gone before is not to be ignored as irrelevant. But the prior State determination of a claim under the United States Constitution cannot foreclose consideration of such a claim, else the State court would have the final say which the Congress, by the Act of 1867, provided it should not have." Brown v. Allen, 344 U.S. 443, 500, 73 S.Ct. 397, 443, 97 L. Ed. 469
 
 
 [7]
 "Of course, these confessions were not voluntary in the sense that petitioners wanted to make them or that they were completely spontaneous, like a confession to a priest, a lawyer, or a psychiatrist. But in this sense no criminal confession is voluntary." Stein v. People of State of New York, 346 U.S. 156, 186, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522
 7Â½ The doctor had given directions on his chart that visits to Burwell should be limited to 10 minutes each. In the afternoon, when the District Attorney questioned Burwell, the interrogation lasted more than 10 minutes; just how much longer is not entirely clear. The hospital chart shows the questioning began at 1:40. The next entry shows penicillin administered at 2:40, but it is not indicated whether this was after the questioning ended.
 The reporter noted that an examination of Rogers began at "about" 3:20, and thought it could have taken 25 minutes ("an approximation") after the Burwell questioning ended until the Rogers examination started. To read the Burwell statement aloud requires 20 minutes. It seems probable that nearly twice that time was consumed in the actual questioning. In any event, much more than 10 minutes elapsed. The physician testified that when the District Attorney asked his consent for the visit to Burwell, he went up to check Burwell's condition, and then permitted them to have the visit. He did not instruct the District Attorney and reporter to limit their visit, for Burwell was in good shape that day, "surprisingly good shape". Asked whether he informed them of the ten minute order, he replied, "I don't recall. I permitted them to see the patient".
 
 
 [8]
 What appears from this record is that Burwell's attitude, both on the evening of the 14th and again on the afternoon of the 15th, was in effect: "Well, you have caught me, and I might as well talk."
 
 
 [9]
 As hereafter noted, these latter statements of the defendants themselves were obtained by them prior to the trial
 
 
 [10]
 The coroner testified: "When I arrived at San Quentin Prison on the night of the fatalities I went to Warden Teets and his office and I asked him — what had happened. He told me, and then I asked him if I could have a copy of all the records or reports that would be taken by the prison personnel for my records and that those reports would be kept by me, the contents not released without the approval of he or the District Attorney."
 In the mandamus proceeding hereafter mentioned the court found: "* * * that said reports and other materials were received by respondent Keaton pursuant to an understanding with the Warden of San Quentin Prison that the contents of said reports would not be released without the approval of said Warden or the District Attorney of the County of Marin."
 
 
 [11]
 Although conceivably they might have been used for impeachment purposes had any of the signers taken the stand and testified contrary to their statements, there is no claim that any such thing happened, or that this use could have been made of them
 
 
 [12]
 See McCormick, Law of Evidence, (1954) p. 210
 
 
 [13]
 "§ 1227. Inspection of public records and other matters — The public records and other matters in the office of any officer, except as otherwise provided, are at all times during office hours open to inspection of any citizen of the State."
 § 1892, Cal.Code of Civil Procedure: "Every citizen entitled to inspect and copy public writings. Every citizen has a right to inspect and take a copy of any public writing of this State, except as otherwise expressly provided by statute."
 
 
 [14]
 If these defendants were wrongfully denied these materials it is plain they were thereby denied an opportunity not only to learn of additional potential witnesses but to inquire through the persons who made these statements whether additional witnesses were available. This is the exploratory process counsel normally follow in preparing for trial and it is essential to a fair trial that this process not be frustrated by the State. A similar rationale is behind the rule that where cross-examination in a certain field is improperly refused, the complaining party need not make an offer of proof nor show what his cross-examination would develop. "It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. * * * To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial." Alford v. United States, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624
 
 
 [15]
 The findings of the Superior Court on the mandamus proceeding was that these documents, including defendants' statements, "were the records and other matters of the office of Coroner * * * convenient and necessary to the conduct and operation of that office." After finding defendants entitled to their own statements, the court found that "there are certain other documents or material in such records consisting of investigative reports of or concerning the apprehension, prosecution and detention of criminals * * * which are of such character as to be privileged as such are so privileged by virtue of an inherent confidential character." The California courts have recognized that the general right to inspect documents in the hands of public officers is subject to exceptions when they are in the offices of "those charged with the execution of the laws relating to the apprehension, prosecution and punishment of criminals." Runyon v. Board of Prison Terms and Paroles, 26 Cal.App.2d 183, 79 P.2d 101. And see Code of Civil Procedure, § 1881, subd. 5: "A public officer can not be examined as to communications made to him in official confidence, when the public interest would suffer by the disclosure."
 
 
 [16]
 If we were to reverse on this point we would be confronted with a difficult problem in framing directions for a proper judgment. In Cranor v. Gonzales, 9 Cir., 226 F.2d 83, we affirmed an order of the district court that the writ of habeas corpus issue and the petitioner, a state prisoner, be released from confinement unless he be granted a new trial within 60 days after the court's judgment became final. In that case the want of due process occurred at the trial, and appropriately a new trial was required. But here, if there was denial of due process, it was on the appeal in the State Supreme Court. A judgment here that the writ issue and petitioners be released unless, within a stated period, the Supreme Court of California reassembled and passed upon the question of whether these were public records, would be an absurdity. For one thing, that court has no further jurisdiction to act in the case, and no way of doing such a thing. The only possible order on reversal would be to require a new trial
 
 
 [17]
 Government Code, § 27491: "It shall be the duty of the coroner to investigate or cause to be investigated, the cause of death of any person reported to the coroner as having been killed by violence * * *. He shall cause the information secured to be reduced to writing and forthwith filed by him in his records of the death of the individual."
 
 
 [18]
 The Supreme Court, on the appeal, stated that the guard was not visible to the defendants. As indicated before, no testimony on this or any other fact was taken in the district court below. The precise facts about the guard are not too clear. Counsel for defendants made no motion concerning his presence to the court as such. The attorney for defendants who testified about the guard on motion for new trial stated that at a recess period he called this matter to the attention of the judge in chambers, and that after the recess period he noticed the judge stop and converse with this guard. He noticed that thereafter the guard remained more or less in the same position throughout Burwell's testimony. Asked whether after the judge spoke to him the guard had the gun out he answered: "I don't know as to that. I can't testify as to that."
 
 
 
 55
 JAMES ALGER FEE, Circuit Judge (concurring in result only).
 
 
 56
 There are no doubts as to the stark, naked facts in this case. These two convicts killed one guard and thereafter assaulted two others, and finally deliberately murdered a fourth because he noted blood on their clothes and was about to report the fact.
 
 
 57
 The death penalty was imposed by the jury. It is hardly conceivable that it could have been otherwise, if the penalty were available, as it is. In all societies, the murder of guards who have been placed by the public over convicted criminals for the protection of the community is looked upon with disfavor.
 
 
 58
 The facts were uncontroverted. Under our system, a jury trial was necessary. After laborious effort, our colleagues have found that the trial was fair and impartial and that no constitutional right of either defendant was violated.
 
 
 59
 Four judicial agencies had passed upon these questions. The trial judge of the state regulated the conduct of the court, made rulings and submitted the case to the jury. The jury passed upon the facts and imposed the penalty of death. The Supreme Court of California unanimously rendered a lengthy and carefully considered opinion. People v. Burwell, 44 Cal.2d 16, 279 P.2d 744; certiorari denied 349 U.S. 936, 75 S.Ct. 788, 99 L.Ed. 1265. The United States District Court reviewed the record, which was before the state courts only. Defendants did not introduce new proofs before that tribunal. Upon this record, habeas corpus was denied. All these judges are bound, as we are, by the provisions of the Federal Constitution.
 
 
 60
 This criticism of the majority opinion is that the long, labored review of a situation which had been fully covered is not only unnecessary, but it is harmful. The elaborate discussion and outright criticism of the State Supreme Court might suggest that we believe we have some supervisory control over the administration of justice in the State of California. We have none.
 
 
 61
 On the chief point to which this criticism is directed, the majority opinion is squarely wrong. The Supreme Court held that the denial of records of the prosecutor, of unsworn statements of employees and persons at the prison on the night of the slayings, which records were temporarily in the hands of the coroner, did not prejudice the rights of either defendant. In the criminal case, the question so adjudicated was the only vital one on this point. If no prejudice were shown by the denial, it matters not whether the records were public or private. The majority does not and could not find this holding that there was no prejudice shown incorrect. Our only function is to discover whether the rights of either defendant under the Federal Constitution were violated.
 
 
 62
 The repeated suggestions that these were close questions as to due process and that the inquiry is not an easy one, in view of the meticulous examination of the record will perhaps indicate to lawyers and the public, and especially to the prison population, that the final result has been arrived at by some process of rationalization. The able and ethical counsel for defendants have made all possible out of the situation by powerful presentation. But the opinion will perhaps suggest to defendants that, if they themselves were a little more astute in their thinking, some possible escape from the penalty for the crime is yet open.
 
 
 63
 There was one deliberate and premeditated murder clearly proved. The trial was fair and impartial. The District Court found no constitutional infirmity. We find none. That conclusion should suffice.
 
 
 64
 I concur in the result only.