**UNITED STATES of America**

v.

**Howard JANKOWSKI.**

**Crim. No. 79–16.**

United States District Court,
W. D. Pennsylvania.

April 18, 1979.

---

Edward J. Schwabenland, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Thomas S. White, Federal Public Defender, Pittsburgh, Pa., for defendant.

## OPINION

MARSH, District Judge.

The defendant Howard Eugene Jankowski has been indicted for violations of 18 U.S.C. §§ 1341 and 1342. It is alleged that the defendant caused checks written by his employer to be sent to him rather than to the payee and that the defendant opened a checking account by representing himself to be an officer of the payee corporation. Defendant has filed a "Motion to Suppress Eyewitness Identification," a "Motion to Suppress," and a "Motion to Dismiss Indict-

ment." An evidentiary hearing was held and the parties requested an opportunity to submit briefs following the filing of the transcript. After consideration of the evidence presented, and after review of the briefs submitted, the court makes the following findings of fact and conclusions of law with respect to defendant's motions.

## I

On the afternoon of October 9, 1978, Janet Mihun, a customer service representative at the Oliver Plaza office of Equibank, was approached at her desk by a man who stated he wanted to open a business account. He identified himself as Mr. Jankowski and produced a Georgia driver's license as identification. He also gave her a corporate resolution and two signature cards. Ms. Mihun opened an account for Mr. Jankowski in the name of KVR, Incorporated. A large check from Koppers Company payable to KVR was deposited in the account, and Mr. Jankowski received a starter kit of temporary checks. This transaction took approximately twenty minutes during which time Ms. Mihun was seated about two feet away from Mr. Jankowski while the details of the new account were discussed and completed. The lighting in the bank office was good, and Ms. Mihun was able to observe the man throughout the transaction. She noticed him to be a thin man in his fifties with grayish hair who wore glasses and acted nervous.

After Mr. Jankowski left the bank, Ms. Mihun took the KVR account application to her supervisors for approval. They immediately were suspicious because all of the papers were from Georgia and the corporate resolution had no seal. The bank's fraud investigation manager, John T. Stevenson, was contacted. In examining the new account application, Mr. Stevenson noticed the name Jankowski and recalled that twelve forged corporate checks cashed at another Equibank office in March 1978 had been endorsed with the name Howard Jankowski. Stevenson then compared the new account signature with the signatures on those previously forged checks and noted a

similarity. That same afternoon, Stevenson returned to Ms. Mihun's office to show her a file picture of Howard Jankowski. He placed the picture in front of her and asked if the man in the photograph was the customer she had waited on. Without hesitation, she replied that it was.

■ Defendant asserts in his motion to suppress eyewitness identification that this single photographic display was unduly suggestive and a violation of due process. In weighing the appropriate factors, the court finds that Ms. Mihun had an opportunity to view Mr. Jankowski with considerable attention for approximately twenty minutes while he provided her with the information for the new account, and that Ms. Mihun identified Mr. Jankowski's photograph with certainty only a few hours after the crime. The court cannot conclude that there is a substantial likelihood of irreparable misidentification. See *Manson v. Brathwaite*, 432 U.S. 98, 114–116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Furthermore, the allegedly suggestive identification procedure was carried out by a bank employee before any law enforcement officer had been contacted about the suspected criminal activity. The motion to suppress eyewitness identification will be denied.

## II

On the following morning, October 10, 1978, Mr. Stevenson called Postal Inspector Ronald Pry to advise him that a large check from Koppers Company payable to KVR, Incorporated, of Highland, Indiana, apparently had been stolen from the mail, and had been presented at the bank by a man identified as Howard Jankowski. Inspector Pry contacted Koppers and KVR to verify that the check had been mailed by Koppers in Pittsburgh but had not been received by KVR in Indiana. Pry determined that the Pittsburgh post office box address which appeared on the check was registered to Howard Jankowski. Thereafter, Pry obtained an arrest warrant charging Jankowski with possession of a stolen check

and then went to Equibank to await Jankowski's return. That afternoon, Pry learned from Koppers Company that a man named Howard Jankowski had been working in that company's invoicing section for about a week and that the check to KVR would have passed through that section prior to being mailed.

Inspector Pry and Inspector Lee Hickson went to the Koppers Company building and, pursuant to the warrant, arrested the defendant in a third-floor hallway. The defendant was frisked for weapons and handcuffed. As he was being escorted away, the defendant requested permission to get his sport coat. A Koppers employee went into another room and retrieved the defendant's coat and a binder-style briefcase which the defendant had left on a shelf above his coat.[1] Pry and Hickson took the defendant to a waiting automobile driven by Inspector Jeff Fowler, and the Koppers employee placed defendant's coat and briefcase on the front seat of the car. Neither Pry nor Hickson saw the briefcase.

After the short ride to the Post Office and Courthouse building, Pry and Hickson escorted the defendant to their office. Fowler parked the car and then brought the coat and briefcase to the office. As Fowler handed the coat to Pry, a long business envelope slid out of the inside coat pocket. The envelope bore the name and return address of Koppers Company in large blue letters. Through the window of the envelope, a cashier's check with the words "Pay to the order of CES–KVR" was visible. Beneath these words was the same Pittsburgh post office box address which had appeared beneath the name of the payee on the check deposited at Equibank the previous day.

The defendant was fingerprinted, and he told the inspectors that his address was 18½ South 13th Street, Pittsburgh. The inspectors gave defendant his coat and took him before a Magistrate who set a surety bond for defendant at $10,000. After escorting the defendant to the Marshal's Office, Inspector Pry returned to his own office. It was at this time that Pry and Hickson first noticed the briefcase. The inspectors deduced that the briefcase must belong to the defendant, and Pry picked it up with the intention of returning it to the defendant at the Marshal's Office. Both Hickson and Pry had been advised that the defendant had two prior weapons convictions. Noticing a bulge in the middle of the briefcase, Hickson decided that it should be checked for weapons before it was returned to the defendant. The briefcase contained no lock, and Hickson opened it by unfastening the single clasp. She immediately saw that the briefcase contained no gun and that an Equibank check was protruding from one of the inside pockets of the binder. The name KVR was typed on the upper corner of the check.

On October 11, 1978, the postal inspectors obtained a search warrant for 18½ South 13th Street. Upon arriving there, they asked about Mr. Jankowski and they were told that "Howard" did not live there but that he did come to that address occasionally to receive messages. The inspectors were told that Jankowski actually lived in an apartment at 2130 Carey Way. After obtaining a search warrant for this second address, the inspectors searched defendant's apartment on October 12, 1978, and found a Koppers Company envelope containing the bottom stub from a cashier's check for $14,000 and a booklet of Equibank temporary starter checks.

Defendant has filed a motion seeking to suppress the Equibank temporary check discovered by Inspector Hickson in defendant's briefcase. The court does not doubt that in undertaking that search, Inspector Hickson and Inspector Pry were making a good faith effort to check the briefcase for weapons before promptly returning it to the defendant. Their good

---

1. This black vinyl briefcase is a three-ring loose-leaf binder with an overlapping flap and a handle on the edge opposite the rings. The flap contains a clasp but no lock. When the brief-case is closed, the contents remain accessible through the two open edges. See Defendant's Exhibit A.

faith, however, is no substitute for a search warrant. The fact that a warrantless search of the briefcase might have been reasonable at the time of arrest does not justify a warrantless search at a later time after the briefcase was in the exclusive control of the postal inspectors. *United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *United States v. Schleis*, 582 F.2d 1166, 1172 (8th Cir. 1978). While there is necessarily a strain in any comparison between the defendant's unlocked vinyl briefcase with open sides and the double-locked 200-pound footlocker in *Chadwick*, it is not disputed that defendant's briefcase was "intended as a repository of personal effects." 433 U.S. at 13, 97 S.Ct. at 2484. Once the briefcase was within the exclusive control of the inspectors and there was no danger that the defendant might gain access to the briefcase to seize a weapon, the defendant reasonably was entitled to the protection of a search warrant before his privacy interest in the contents of the briefcase was invaded. 433 U.S. at 15–16, 97 S.Ct. 2476. As to the check found in defendant's briefcase, the motion to suppress will be granted.

▆▆▆ Defendant argues that the search of the apartment on Carey Way is tainted by the reference in the search warrant affidavit to the check found in the briefcase. The court finds this argument unpersuasive. The affidavit itself indicates that Inspector Pry had independent lawful evidence pertaining to the Equibank temporary starter checks prior to the search of defendant's briefcase. This independent evidence as set forth in the affidavit (Government Exhibit 3) was sufficient to support a finding of probable cause for a search of defendant's residence. The inclusion in an affidavit of allegations based on illegally obtained evidence does not render the resulting warrant invalid where the independent and lawful information stated in the affidavit is sufficient when considered alone to support a finding of probable cause. See *United States v. Giordano*, 416 U.S. 505, 555–556, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1973) (Powell, J., concurring and dissenting).[2] Defendant's request to suppress the evidence seized during the search of the Carey Way apartment will be denied.

In his brief, defendant also argues that the search warrant for the apartment is invalid because the inspector relied upon uncorroborated facts from informants whose credibility was not demonstrated to the Magistrate. Specifically, defendant relies upon the decisions of the Supreme Court in *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

In *Harris*, the Court dealt with the question of whether there was a sufficient basis for crediting the report of an unidentified informant "who purports to relate his personal knowledge of *criminal activity.*" 403 U.S. at 575, 91 S.Ct. at 2078 (emphasis supplied). Similarly, in *Aguilar* an unidentified informant had represented that heroin and other narcotics were being kept at a certain location, 378 U.S. at 109, and in *Spinelli* an unidentified informant had provided a tip that a certain individual was operating an illegal gambling business. 393 U.S. at 414, 89 S.Ct. 584. These situations are quite different from the affidavit in the instant case where the individuals relied upon are identified by name and address. See *United States v. Spach*, 518 F.2d 866, 870 (7th Cir. 1975).

▆▆▆ Furthermore, the individuals identified in paragraphs 12 and 13 of the affidavit were not relied upon for their personal knowledge of any criminal activity. The first several paragraphs of the affidavit are

**2.** Justice Powell quotes with approval the following statement from *United States v. Epstein*, 240 F.Supp. 80, 82 (S.D.N.Y.1965):

"There is authority, and none to the contrary, that when a warrant issues upon an affidavit containing both proper and improper grounds, and the proper grounds—considered alone—are more than sufficient to support a finding of probable cause, inclusion of the improper grounds does not vitiate the entire affidavit and invalidate the warrant."

sufficient to demonstrate that there was probable cause to believe that criminal activity had occurred and that evidence relating to that activity could be found at defendant's residence. The individual private citizens identified in paragraphs 12 and 13 are relied upon solely to provide the defendant's address. In each instance, the affidavit explains how these individuals came by their information (*i. e.*, Mr. Nolan had visited Mr. Jankowski at the apartment at 2130 Carey Way and knew it to be the first door on the left at the top of the staircase; Mrs. Kennedy had loaned her portable electric typewriter to Mr. Jankowski). Both individuals provided the same address for the defendant, and the Magistrate could reasonably infer from the affidavit that these individuals had gained their information in a reliable manner. *Harris*, 403 U.S. at 579, 91 S.Ct. 2075; *Spinelli*, 393 U.S. at 416–417, 89 S.Ct. 584.

### III

Defendant asserts that the indictment should be dismissed because there was unnecessary delay by the government in presenting the charges to the grand jury. The parties have stipulated to the following chronology.

1. On October 10, 1978, Howard Jankowski was arrested by United States Postal Inspectors on a complaint charging a violation of 18 U.S.C. § 1708. Bond was set at $10,000 and Jankowski was lodged at the Allegheny County Jail. A detainer was filed against him by the State of Georgia.

2. On October 16, 1978, following a preliminary hearing, Jankowski was held for charges of mail fraud (§ 1341) rather than possession of stolen mail (§ 1708).

3. At the conclusion of the preliminary hearing, the defendant's appointed attorney advised the prosecutor in the presence of Postal Inspector Pry that the defendant would waive indictment and plead to an information.

4. A case report was submitted by the United States Postal Service to the United States Attorney's Office on November 8, 1978.

5. On December 15, 1978, a copy of the information and a plea letter were mailed to defendant's attorney. The defense attorney received the copy of the information at his office on December 20, 1978.

6. On Friday, January 5, 1979, the defendant's attorney advised the prosecutor for the first time that the defendant would not waive an indictment and would not plead to the information. The prosecutor never received any notice that the defendant had been depressed while in jail. (Tr. 17).

7. On January 5, 1979, the prosecutor determined that the earliest time the charges could be presented to a grand jury would be Wednesday, January 10, 1979.

8. On January 10, 1979, a federal grand jury indicted Howard Jankowski for mail fraud.

9. On January 18, 1979, Magistrate Robert C. Mitchell ordered that since the defendant had been incarcerated for more than 90 days the defendant could be released on $10,000 unsecured bond if the State of Georgia removed its detainer.

Testimony by the defendant revealed that he had been admitted to the jail hospital on December 15, 1978, for eleven days (Tr. 7–8). Defendant testified that he was very depressed during this period because he "just couldn't take sitting in that jail, waiting to find out what the United States Attorney was going to do." (Tr. 7). As a result of this depression, the defendant thought about suicide but was not sure whether he wanted to die (Tr. 9–10). In the hospital he received medication which apparently relieved his depression (Tr. 10). Defendant testified that he had been told shortly after his arrival at the jail that the State of Georgia had filed a detainer against him in connection with an alleged check forgery (Tr. 11–12).

Defendant's claim that there has been unnecessary delay by the government requiring dismissal pursuant to Rule 48(b), Fed.R.Crim.P., is based on the assertion that the delay has prejudiced the defendant. Thus, an evaluation of the Rule 48(b)

claim is encompassed in the court's consideration of the question of whether there has been a violation of defendant's right to a speedy trial under the Sixth Amendment. See *United States v. Dreyer*, 533 F.2d 112, 113 n.1 (3rd Cir. 1976). A determination of the constitutional question requires the court to utilize a balancing test in which the conduct of both the prosecution and the defendant are weighed. In *Barker v. Wingo*, 407 U.S. 514, 530–533, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court identified the principal factors to be considered.[3]

The length of delay is the threshold consideration. Here, 92 days elapsed between defendant's arrest and the return of an indictment. Because this exceeds the goals set forth in the Speedy Trial Act, 18 U.S.C. § 3161(b), and in this district's "Plan for the Prompt Disposition of Criminal Cases,"[4] the court will proceed to examine the reasons for the delay and whether the defendant suffered prejudice as a result.

■ The arrest of the defendant occurred within several hours after the government learned of the suspected criminal activity. At least some of the period between arrest and indictment in this case reasonably may be attributed to necessary investigation. The government received the Postal Service case report on November 8, 1978. Although at first the alleged crime appeared to be simply a case of mail theft, it later appeared that the appropriate allegation was that defendant had devised a mail fraud scheme in violation of § 1341 and § 1342. Reasonable investigatory delay is not one-sided or necessarily prejudicial against a defendant. See *United States v. Lovasco*, 431 U.S. 783, 795, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). A defendant can be adversely affected by an indictment and trial involving less than all of the criminal acts for

which he may be responsible, since he otherwise is likely to be subjected to multiple trials growing out of the same series of events. 431 U.S. at 792 n.12.

■ Following the government's receipt of the Postal Service report, five weeks passed before the information was prepared. There is no evidence to suggest that this was a deliberate delay by the government in an effort to gain a tactical advantage. It does appear, however, that some portion of this time was delay caused by the fact that the prosecutor was required to devote his time to other cases (Tr. 94). Such a neutral reason should be weighed less heavily than deliberate delay, but it nevertheless must be weighed against the government. *Barker*, 407 U.S. at 531, 92 S.Ct. 2182.

■ The information was prepared and mailed to defense counsel on December 15, 1978. In light of the previous indications by the defendant that he would plead guilty to the information (Tr. 5, 8), the government did not act unreasonably in giving the defendant such an opportunity before presenting the case to the grand jury. On January 5, 1979, the government was advised that the defendant would not plead to the information. While it cannot be said that this delay from December 20 through January 5 should be weighed heavily against the defendant, it must be noted that the detrimental impact of his incarceration during this particular period was minimized by the fact that the next move belonged to the defendant. When the defendant indicated his decision to reject the information, the government acted promptly in presenting the matter to the grand jury which indicted the defendant on January 10, 1979. Shortly thereafter, the defendant filed a motion to dismiss asserting his right to a speedy trial.

---

**3.** Although in *Barker* the Court was examining post-indictment delay, the balancing process described therein is applicable to an examination of pre-indictment delay in this case where the defendant was arrested and incarcerated prior to his indictment. See *Dillingham v. United States*, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975).

**4.** The Plan specifically provides that dismissal is not mandatory where the time limits are exceeded. The sanctions of the Speedy Trial Act are not in effect at this time. 18 U.S.C. § 3163(c).

Defendant has not alleged that there has been any specific prejudice to his ability to present a defense to this indictment. Nor is there any allegation that the delay has disrupted his employment, strained his family ties, depleted his financial resources, or subjected him to public obloquy. Defendant did testify, however, that he suffered an anxiety reaction to his confinement while awaiting disposition of these charges.

■ Severe personal anxiety resulting from inordinate delay can amount to a violation of a defendant's constitutional guarantee of a speedy trial. See *United States v. Dreyer*, 533 F.2d 112, 116–117 (3rd Cir. 1976), where there was a delay of 29 months between indictment and trial. The instant situation is distinguished from *Dreyer* not only by the length of the delay itself, but also by the duration and the degree of the anxiety suffered. In *Dreyer*, the appellant went through eleven months of intensive therapy for acute anxiety and depression following her arrest and, despite the therapy and antidepressant medication, her condition continued to deteriorate, eventually resulting in a deeply disturbed personality pattern. In our case, the defendant's depression lasted only eleven days and apparently it was relieved completely by the medication defendant received. While neither of these situations is desirable, the court concludes that the eleven-day period of depression described by the defendant is within that "certain amount of anxiety and other forms of personal prejudice to the accused [which] is inevitable in a criminal case." 533 F.2d at 116.

■ Accordingly, after balancing the facts before the court at this time, it is concluded that defendant's constitutional right to a speedy trial has not been violated. The motion to dismiss the indictment will be denied.

An appropriate order will be entered.