STATE OF WEST VIRGINIA

*v.*

CHARLES W. PEACHER, JR.

(No. 14233)

Decided July 14, 1981.

*Askin & Burke* and *Steven M. Askin* for Charles W. Peacher, Jr.

*Chauncey H. Browning*, Attorney General, *Silas B. Taylor*, Assistant Attorney General, for the State.

McHUGH, JUSTICE:

The appellant, Charles W. Peacher, Jr., was convicted of the crime of murder in the first degree of Rowlen E.

Moreland, a former sheriff of Jefferson County. The case is before this Court on an appeal from a final order of the Circuit Court of Jefferson County, entered on June 6, 1977, sentencing the defendant to life imprisonment in the West Virginia Penitentiary without parole, and denying the defendant's motion to set aside the verdict and award him a new trial. On this appeal the defendant assigns error in three general areas which will be considered in order: (1) the trial judge's refusal to grant a motion for a change of venue and his restriction of the scope of the *voir dire* of the jury; (2) the security precautions allowed by the trial judge at the trial; and (3) the trial judge's refusal to grant defense motions for the suppression of evidence.

## I. *FACTS*
### A. *Voir Dire and Change of Venue.*

Prior to his trial, the defendant moved the Circuit Court of Jefferson County for a change of venue on the grounds that the publicity surrounding the crime with which he was charged made it impossible for him to receive a fair trial in Jefferson County. In support of his motion the defendant submitted twenty articles from local newspapers and fifteen transcripts of news broadcasts that had been aired on local radio stations. In opposition to the motion the State submitted twenty affidavits in which various citizens of Jefferson County stated that there was no local prejudice against the defendant of such a nature as to prevent him from receiving a fair trial.

An evidentiary hearing on the motion for a change of venue was held on September 24, 1976. The defense presented seventeen witnesses and the State presented four. In general, the evidence presented at this hearing was ambiguous and inconclusive on the question of whether an impartial jury could be impanelled in Jefferson County.[1]

---

[1] Two examples will serve to illustrate the ambiguous nature of the evidence presented. On direct examination by the defense, one witness, a barber in Shepherdstown, testified that "it would be hard for this guy to get a fair trial. If I had to sit on a jury my mind is partially made up right now before I even get here, through knowing

There was no testimony or evidence that indicated that the prosecuting authorities or police had used the media to influence, or attempt to influence, public opinion about the case.[2] The motion for change of venue was denied.

The motion for a change of venue was renewed on April 22, 1977. The basis for the renewed motion was that, due to pre-trial proceedings, publicity about the case had continued to the prejudice of the defendant. In support of the

---

Mr. Moreland and the type of man he was." On cross-examination, however, it became clear that the witness was expressing a personal opinion based on his friendship with the deceased victim. He resisted questions regarding community sentiment but did indicate that his conversations with his customers were general in nature and did not reveal a community sentiment opposed to the defendant. The second example is an opinion poll introduced by the defendant. The defendant's expert testified that, based on the results of the poll, it was his opinion that the defendant could not get a fair trial in Jefferson County. The expert relied primarily on the response to one question in the poll: "Some people are saying the man who was arrested in probably guilty. Do you agree with this?" Thirty-eight percent of the people polled responded in the affirmative, twenty-six percent in the negative, and thirty-nine percent had no response. The question itself is poorly worded and ambiguous. Those answering "yes" could have been saying either that the statement was accurate in that some people were making the statement or that they agreed that the defendant was guilty. The ambiguity of the question is highlighted by responses to other questions in the survey. For example, only 41 of 115 people (thirty-six percent) responded affirmatively to the question: "Have you thought at all about whether the man who was arrested for killing the former sheriff was guilty?" Only twenty-six percent of the people polled responded affirmatively to the question: "Some people think that with all the publicity given the case it would be hard for the man arrested to get a fair trial. Do you agree?" And seventy-eight percent of those polled answered "yes" to the question: "Assume that a friend or member of your family was standing trial in the place of the man presently charged with this crime. Would you be satisfied jurors with the same frame of mind as yours could arrive at a fair verdict?"

[2] For example, none of the articles or transcripts introduced by the defendant contained comments on the evidence by either the prosecution of the police, nor did they contain statements by State authorities regarding the defendant's guilt or innocence. The more common vein in the articles is reflected by the following quote: "State police this morning said no new information concerning the case was being released at this time as investigation continues."

motion the defendant offered twenty-seven articles from local papers. The motion was again denied.

*Voir dire* of perspective jurors began on May 23, 1977. In all, thirty-five prospective jurors were interviewed. Six jurors were excused for medical, personal or job related reasons. An additional six jurors were excused for cause. Four additional challenges for cause made by the defense were denied. Additionally, the trial judge refused to ask follow-up questions of specific jurors when requested to do so by the defense. The trial judge also refused a request to ask the panel four specific questions propounded by the defense. After *voir dire* the defense renewed its motion for a change of venue and that motion was again denied.

## B. *The Guard.*

On the first day of trial the defense objected to having a deputy sheriff seated within the bar of the court behind the defendant. The trial judge noted, on the record, that the deputy was seated approximately fifteen feet from the defendant and was dressed in civilian clothing. The motion to prohibit such placement of the deputy was overruled.

The motion was renewed the following day. The trial judge noted that he was relying on the superior experience of the sheriff in providing security and again denied the motion. The defense counsel then requested an evidentiary hearing on the necessity of such a security precaution. The trial judge declined to hold such a hearing.

On the third day of the trial the defense again renewed this motion alleging that the same deputy who was seated near the defendant had escorted the jury to lunch on the previous day. The trial judge again denied the motion saying that he had seen the deputy in the restaurant at a table separate and apart from the jury.

## C. *The Searches.*

Around 11:00 a.m., on June 30, 1976, Corporal R. L. Johnson, Commander of the Charles Town detachment of the West Virginia State Police, received a call reporting a shooting at the residence of Rowlen E. Moreland near Middleway in Jefferson County. Mr. Moreland had been

found shot to death in the front yard of his home. The autopsy report indicated that he died from twelve wounds inflicted at close range with a .38 caliber weapon.

Corporal Johnson proceeded to the Moreland residence with Troopers Wingler and Kimble, arriving at approximately 11:25 a.m. At the scene of the crime Corporal Johnson saw indications that the Moreland home had been forcibly entered and ransacked. Corporal Johnson also observed the deceased victim's pickup truck parked halfway up the driveway of the house. In inspecting the area around the truck, he noticed tracks in the yard where a car, equipped with snow tires, had apparently pulled around the parked truck. Corporal Johnson made a plaster cast of those tracks.

While Corporal Johnson inspected the scene of the crime, Trooper Wingler interviewed serveral witnesses. One informed him that he had driven by the Moreland residence at approximately 11:00 a.m., and had observed a white Ford with a black top backed up to the carport in the Moreland driveway. The witness stated that it appeared to him that furniture had been loaded into the car. The witness also told Trooper Wingler that he had seen someone standing over Mr. Moreland's prone body which was lying in the front yard. The witness was unable to describe the person he saw standing over Mr. Moreland. A second witness was able to describe the person standing over Mr. Moreland to Trooper Wingler. The person was described as wearing a red bandana around his head and wearing a blue plaid shirt. This witness also described the automobile and stated that, as she drove past the Moreland home, she heard gunshots. Trooper Wingler also learned that the automobile bore temporary license plates. Trooper Wingler promptly passed the information he had garnered from the witnesses to other officers investigating the slaying.

At approximately 12:00 p.m., Sergeant J. D. Smith of the Martinsburg detachment of the West Virginia State Police received a call from Constable Donald Giardina. The constable told Sergeant Smith that he had heard about the shooting at the Moreland residence and had, earlier in the day, seen a car at the scene which he described as a black

over white Ford. Constable Giardina stated that he personally knew that the car belonged to "the Peacher boy" whom he had seen at the Moreland home that morning. Sergeant Smith relayed this information to Corporal Johnson by telephone and then proceeded to join the investigation at the scene of the crime.

A check of used car dealers in the area soon revealed that Smoot's Auto in Charles Town had recently sold a black over white Ford LTD to Charles W. Peacher, Jr. A Department of Motor Vehicles' check on the license number confirmed that the car was registered to Charles Peacher, Jr. By this time the investigation was expanding and involved a large number of state troopers. Corporal Johnson radioed the description of the vehicle, and the identity and description of the suspect, to the other officers involved in the investigation.

At approximately 2:30 p.m., Troopers W. D. Plantz and G. A. Stevens left the Charles Town barracks to search for the suspect. The troopers knew that they were looking for a suspect, probably armed, in the Moreland slaying who had been identified as Charles, or "Chuckie", Peacher, and described as wearing a red bandana around his head, having long blond hair, and driving a black over white Ford LTD with temporary tags.

As they traveled north on Dark Lane in Leestown, Trooper Plantz saw a black over white vehicle coming towards them traveling in the opposite direction. As the car drew closer Trooper Plantz recognized it as a black over white Ford LTD. Although a woman was driving the Ford, Trooper Plantz recognized the occupant of the passenger seat in the vehicle, who was wearing a red bandana, as Charles Peacher. As the car passed the troopers' cruiser, Trooper Plantz observed that it bore temporary license plates. Trooper Stevens, who was driving, immediately turned the cruiser and followed in the direction taken by the defendant's car. They found the Ford parked in a driveway a short distance from where it was first observed. As the troopers stopped, they saw a woman, Donna Fraley, getting out of the driver's side of the car. They did not see Charles Peacher at this point. Trooper Plantz questioned

Miss Fraley as to Charles Peacher's whereabouts. Miss Fraley denied having seen Peacher that day and said that she had no knowledge about where he might be.

The Ford was parked in the driveway of Charles Peacher's mother's house trailer. Mrs. Peacher came out of her trailer and asked the trooper's purpose in being there. The troopers identified themselves and asked Mrs. Peacher if her son was in the trailer. Mrs. Peacher responded in the negative. Troopers Plantz and Stevens then radioed a request for assistance.

Within a few minutes four additional troopers, including Corporal Johnson and Troopers Wingler and Kimble, arrived at Mrs. Peacher's trailer. While the other troopers searched the trailer and outbuildings for Charles Peacher, Trooper Kimble inspected the Ford. He found a spent .38 caliber cartridge on the ground behind the vehicle and noticed that the snow tires on the rear wheels of the Ford had a tread similar to the tracks which he had previously seen in the yard of the Moreland home. At that point Trooper Kimble searched the trunk of the car and found two shotguns. A tow truck was called and the Ford was taken to Carson's Auto Body Shop where Trooper Kimble removed the shotguns and rear tires from the car and took them to the state police barracks in Charles Town. Trooper Kimble then rejoined the investigation.

After Corporal Johnson and the others had searched Mrs. Peacher's residence and the surrounding property, Donna Fraley admitted to Trooper Stevens that Charles Peacher had been in the car when he and Trooper Plantz had first seen it. She said that Peacher had jumped out of the car and he ran into a field shortly after they had passed the troopers' cruiser on Dark Lane. Trooper Stevens reported this to Corporal Johnson. The Corporal, acting on the new information, called in additional assistance and began a sweep search of the field. The time was approximately 3:30 to 4:00 p.m. The search of the field proved unsuccessful.

The suspect was still at large at 5:30 p.m. when Corporal Johnson, Sergeant Smith and Trooper Plantz met in Leestown to plan further strategy. At that time Corporal

Johnson sent Troopers Wensell and Corley to the defendant's residence with orders to stay outside of the residence and secure it in case Peacher should return to it. The troopers, upon arrival at the defendant's trailer, checked the door and found that it was locked. Additionally, the air conditioner was running and there were two dogs tied near the trailer with food and water in their bowls. The troopers then sat down to wait.

Approximately twenty minutes later Corporal Johnson, Sergeant Smith and Troopers Plantz and Haines arrived at the defendant's trailer. Corporal Johnson examined the area around the trailer and found a piece of wood veneer that, from his observation, had been broken off of a stereo cabinet left in the Moreland carport by the person who had burglarized the house. At that point a decision was made to enter the trailer. Corporal Johnson testified that he believed the defendant to be home because the air conditioner was running and the door was locked. He testified that the entry was made for the purpose of arresting Peacher.

The troopers knocked on the door of the trailer and announced their identity and purpose but received no response. They then went to the rear of the trailer where they removed the glass from a window. Two troopers boosted Trooper Plantz through the window. As Trooper Plantz went through the window, someone handed Trooper Plantz Sergeant Smith's revolver.

Once inside the trailer Trooper Plantz checked all of the rooms looking for Peacher. He was not at home. Trooper Plantz then unlocked the front door of the trailer admitting Corporal Johnson. Prior to his arrival at the trailer, Corporal Johnson had obtained a list of property missing from the Moreland home. Corporal Johnson and Trooper Plantz observed items in the trailer similar to some of the missing property. The troopers then secured the trailer and Corporal Johnson and Sergeant Smith left to obtain a search warrant. On the way to the magistrate's office Corporal Johnson stopped at the Moreland residence where he compared the piece of wood veneer, found outside of the trailer prior to the entry, with the stereo cabinet that had

been left in the Moreland carport. In his opinion the fragment found at Peacher's trailer matched a broken portion of the stereo cabinet.

The affidavit for a search warrant, filed with a magistrate by Corporal Johnson, recited the following facts as grounds for the issuance of the warrant: (1) the burglary and murder; (2) the information received from Constable Giardina; (3) the tire tracks found in the yard at the scene of the crime; (4) the discovery of the similar tires on a car matching the description of the car seen at the Moreland residence that morning which was registered to the defendant whose premises were sought to be searched; (5) the piece of wood veneer found outside of the trailer; (6) the check of that piece of wood veneer against the stereo cabinet at the Moreland residence and the positive result of that check; and, (7) the information gained from the troopers' prior entry of the trailer. The magistrate, satisfied that probable cause was established, issued the search warrant. The warrant was executed at 11:00 p.m. on June 30, 1976, by Corporal Johnson and others, at which time various items of evidence were seized.

While Corporal Johnson and Sergeant Smith sought the search warrant, Troopers Bradley and Kimble stayed behind to keep the Peacher trailer under observation. They were parked alongside of the road near the driveway to Peacher's trailer in an unmarked pickup truck when Trooper Bradley heard someone at a house next door to Peacher's trailer say, "Go to the road." At that point the troopers saw someone running from the general direction of Peacher's trailer towards the road. The time was 10:00 p.m. As the running figure passed the truck, Trooper Bradley jumped from the passenger side and shouted, "Halt, State Police!" The running figure did not stop and Troopers Bradley and Kimble pursued on foot. The figure ran into a yard and around a house. Trooper Bradley followed the fleeing figure while Trooper Kimble circled the house in the other direction. At the corner of the house Trooper Bradley confronted his quarry with his weapon drawn. The person threw up his hands and asked the trooper not to shoot. Trooper Bradley immediately asked

the cornered figure to identify himself, to which the person responded: "Chuckie Peacher." By this time Trooper Kimble had arrived. Trooper Kimble advised Peacher that he was under arrest and, after advising him of his rights, searched him. A red bandana and a gold watch were discovered when Peacher was searched. The watch bore the inscription: "D.W.R." Mrs. Moreland testified that the initials were those of a cousin who had given the watch to Rowlen Moreland some thirty years prior to his untimely demise at the hands of a gunman in his own front yard.

## II. *CHANGE OF VENUE AND VOIR DIRE*
### A. *Change of Venue.*

The defendant assigns as error the trial court's refusal to grant the motion for a change of venue after the evidentiary hearing on the motion and after *voir dire* of the jury. On this appeal the defendant argues that the refusal to grant the motion was an abuse of discretion and reversible error.

A person accused of a crime may, under our *Constitution* and statutes, obtain a change of venue when he shows that there is a good cause for such a change. *W. Va. Const.*, art. III, § 14; *W. Va. Code*, 62-3-13. The initial burden of showing good cause for granting a change of venue rests upon the defendant. *State v. Wilson,* 157 W. Va. 566, 202 S.E.2d 828 (1974). The question is a matter within the discretion of the trial court and the standard on review is whether that discretion has been abused. *State v. Dandy,* 151 W. Va. 547, 153 S.E.2d 507 (1967). Prejudicial pre-trial publicity may, in some circumstances, require that a motion for a change of venue be granted. *See State v. Sette,* 242 S.E.2d 464 (W. Va. 1978).

Widespread publicity, however, is not, standing by itself, enough to require a change of venue. *State v. Hamric,* 151 W. Va. 1, 151 S.E.2d 252 (1966). A change of venue will be granted in West Virginia when it is shown that there is "a present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial. . . ." Syl. pt. 1, *State v. Siers,* 103 W. Va. 30, 136 S.E. 503 (1927). *See also State v. Pratt,* 244 S.E.2d 227 (W. Va. 1978);

*State v. Sette, supra.* Additionally, the prejudice against the defendant must be shown to be such that he cannot receive a fair trial in the county where trial would be held if the motion is not granted. *State v. Riley*, 151 W. Va. 364, 151 S.E.2d 308 (1966).

In *State v. Sette, supra,* the defendant had been accused of conspiring with his mistress to murder his wife. The trial was "preceded by substantial, pervasive, and inflammatory publicity." *Id.* at 468. A telephone poll indicated, in clear terms, "a pervasive hostile climate" toward the defendant in the county in which the murder and the trial occurred. *Id.* The prosecuting attorney and law enforcement officers involved in the case made numerous statements to the press which "would have led any reasonable newspaper reader or TV viewer to believe the case were [sic] open and shut." *Id.* at 469-470. It was also apparent in that case that nearly fifty percent of the jurors summoned for jury duty were disqualified because they had formed a conclusion that the defendant was guilty and were unable to discard that conclusion. *Id.* at 468. On the basis of those facts we held that such hostile sentiment was shown to exist in the community so as to cause the failure to grant the motion for a change of venue to be an abuse of discretion and reversible error. *Id.* at 470.

The case presently before us may well be distinguishable in several ways from *State v. Sette, supra,* but the main distinction is in the record that was developed on *voir dire* of the jury panel. In *Sette* it was noted that "defense counsel carefully noted that in virtually all instances the reason for disqualification [of jurors] was apparently a belief in [the] guilt [of the defendant]." 242 S.E.2d 468. The careful *voir dire* in *Sette* stands in sharp contrast to this case where the *voir dire* was limited and defense counsel was not allowed to inquire into areas indicative of possible bias or prejudice on the part of the jurors. *See* discussion, section II, B, *infra.* We are of the view, therefore, that we cannot rule on the question of whether the defendant met his burden of showing a present hostile sentiment nor whether the trial court abused its discretion in refusing to grant a change of venue. The defense was not allowed to

fully develop the record as it should have been. In a criminal case the defendant who is trying to show the existence of a present hostile sentiment in the community that would affect his right to a fair and impartial jury panel should have a wide latitude of inquiry on *voir dire.* That latitude was not allowed in this case. We need not consider whether this would be an independent error requiring reversal because the judgment of the circuit court is reversed on other grounds.

## B. *Voir Dire.*

The defendant also assigns the trial court's limitation of the scope of inquiry on *voir dire,* mentioned above, as error in and of itself. Specifically, the defendant argues that it was error for the trial court to refuse to allow defense counsel to question the jury panel or to ask specific questions propounded to the court by the defense counsel. The defendant asserts that the trial court's action in so limiting the scope of inquiry on *voir dire* made it impossible to effectively and adequately exercise his peremptory challenges thereby violating his right to due process of law and effective assistance of counsel. We find merit in his argument.

The scope of *voir dire* is generally a matter within the discretion of the trial court and is not subject to review except for abuse of discretion. *State v. Beacraft,* 126 W. Va. 895, 30 S.E.2d 541 (1944). A fair trial, however, requires a fair and impartial jury. *See W. Va. Human Rights Comm. v. Tenpin Lounge, Inc.,* 211 S.E.2d 349 (W. Va. 1975); *State v. Stonestreet,* 112 W. Va. 668, 166 S.E. 378 (1932); *State v. Lohm,* 97 W. Va. 652, 125 S.E. 758 (1924). The purpose of *voir dire* is to assure that the defendant's right to a jury free of interest, bias or prejudice is protected and effectuated. *State v. McMillion,* 104 W. Va. 1, 138 S.E. 732 (1927). *Voir dire* works to protect that right not only by providing the basis for challenges for cause but also by providing a basis to "enable a litigant and his counsel to exercise reasonable judgment in utilizing peremptory challenges." *State v. Pendry,* 227 S.E.2d 210 (W. Va. 1976). Where a trial court's restriction of the scope of *voir dire* undermines the rights

sought to be protected by the *voir dire* process it will be held to be an abuse of discretion and reversible error.

In *State v. Pratt*, 244 S.E.2d 227 (W. Va. 1978), the trial court asked whether any member of the jury panel was related to a law enforcement officer. Four jurors responded to the question and the defense counsel requested further inquiry which was denied. We held that such denial was an abuse of discretion requiring reversal. In that situation we held that the court should have either permitted further inquiry or dismissed the jurors who had responded to the question: "Jurors who on *voir dire* of the panel indicate possible prejudice should be excused, or should be questioned individually either by the court or by counsel to precisely determine whether they entertain bias or prejudice for or against either party, requiring their excuse." Syl. pt. 3, *State v. Pratt, supra.*

In *State v. West*, 157 W. Va. 209, 200 S.E.2d 859 (1973), the defendant sought to challenge a member of the jury panel for cause due to his employment by the West Virginia State Police. In holding that the trial court's overruling of the challenge was error we said:

> A defendant is entitled to a panel of twenty jurors who are free from exception, and if proper objection is raised at the time of impaneling the jury, it is reversible error for the court to fail to discharge a juror who is obviously objectionable. In any case where the trial court is in doubt, the doubt must be resolved in favor of the defendant's challenge, as jurors who have no relation whatsoever to the State are readily available.

200 S.E.2d at 866.

From the principles stated in *Pratt* and *West* it follows, *a fortiori*, that the trial judge in the case before us, committed reversible error when he absolutely refused to inquire into any potential relationship between members of the jury panel and law enforcement agencies or personnel. Under *State v. Pendry, supra*, it was also error not to allow or conduct further inquiry into the relationships between jurors who stated that they knew the

defendant or his victim so as to determine whether the juror was prejudiced by his knowledge or relationship.

The right to a trial by an impartial, objective jury in a criminal case is a fundamental right guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article III, Section 14 of the West Virginia Constitution.[3] *See W. Va. Human Rights Comm. v. Tenpin Lounge, Inc., supra.* A meaningful and effective *voir dire* of the jury panel is necessary to effectuate that fundamental right. It is an abuse of discretion and reversible error for a trial judge, in the exercise of his discretionary control over the scope of inquiry during *voir dire*, to so limit the questioning of potential jurors as to infringe upon a litigant's ability to determine whether the jurors are free from interest, bias or prejudice, or to effectively hinder the exercise of peremptory challenges. In a trial for murder, where, as here, the victim was at one time a law enforcement officer, it is clearly material to inquire into any possible relationship between potential jurors and law enforcement officers or agencies. The trial court's refusal to conduct or permit such an inquiry was, therefore, an abuse of discretion. The judgment of the trial court is, therefore, reversed and the case remanded for a new trial.

Although the case is reversed on this ground only, the defendant raises additional questions regarding security precautions taken at his trial, and the application of the suppression sanction, that merit discussion.

### III. THE GUARD

The defendant claims that the trial court's refusal to grant his motion to prohibit placement of a deputy sheriff

---

[3] *U.S. Const.* Amend. VI provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ." *U.S. Const.* Amend. XIV provides, in pertinent part: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *W. Va. Const.* Art. 3, § 14 provides, in pertinent part: "Trials of crimes, and misdemeanors, unless herein otherwise provided, shall be by a jury of twelve men, public, without unreasonable delay. . . ."

within the bar of the court was error. He argues that the presence of the deputy conveyed to the jury the impression that he was a dangerous criminal, thereby undermining the presumption of innocence to which he was entitled and denying him due process of law. The defendant also argues that the trial judge should have received evidence on the question of whether such a security precaution was necessary and that the judge impermissibly shifted responsibility for such a determination to the sheriff. In support of this assignment of error, the defendant mainly relies upon two lines of cases in which a person accused of a crime was forced to appear for trial in either prison garb or physical restraints.[4]

Forcing a person to appear for a criminal trial dressed in identifiable prison garb is a practice long disfavored and frequently condemned. As the Supreme Court of Colorado said in *Eaddy v. People*, 115 Colo. 488, 174 P.2d 717, 718-719 (1946): "The presumption of innocence requires the garb of innocence, and regardless of the ultimate outcome, or of the evidence awaiting presentation, every defendant is entitled to be brought before the court with the appearance, dignity, and self-respect of a free and innocent man." The United States Supreme Court recognized that forcing a defendant to appear for a criminal trial in identifiable prison garb violates the defendant's right to due process of law in *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). This Court has also recently recognized the rule in Syl. pt. 2, *State ex rel. McMannis v. Mohn*, 254 S.E.2d 805 (W. Va. 1979), where we held: "A criminal defendant has the right under the Due Process Clause of our State and Federal Constitutions not to be forced to trial in identifiable prison attire."

A related line of cases deals with those situations in which a person accused of a crime has been forced to appear for trial in physical restraints. As a general rule this practice is disfavored except where physical restraints are necessary to "prevent the escape of the accused, to protect

---

[4] The term "physical restraints," as used here, refers to all forms of handcuffs, shackles, manacles, leg irons and other similar restraining devices.

everyone in the courtroom, [or] to maintain order during trial." *Woodards v. Cardwell,* 430 F.2d 978 (6th Cir. 1970).

There are three valid considerations underlying the reluctance on the part of courts to permit the trial of a defendant in physical restraints. The first is that such treatment of a defendant must inevitably cause the jury to infer that the judge thinks him to be a dangerous man. *State v. Kring,* 64 Mo. 591 (1877). Physically restraining the defendant may also interfere with his ability to participate in his own defense or his privilege of being a competent witness on his own behalf. *People v. Harrington,* 42 Cal. 165 (1871). The final consideration commonly advanced for not favoring the practice is that such treatment of the defendant detracts from the dignity and decorum of the judicial process. *Illinois v. Allen,* 397 U.S. 337, 90 S.C. 1057, 25 L.Ed.2d 353 (1970). The trial of a defendant in physical restraints is usually considered to be prejudicial *per se* and the state has the burden of showing that the security measures were necessary. *See, e.g., United States v. Samuel,* 431 F.2d 610 (4th Cir. 1970); *Woodards v. Cardwell, supra; Loux v. United States,* 389 F.2d 911 (9th Cir. 1968); *State v. Roberts,* 86 N.J. Super. 159, 206 A.2d 200 (1965); *People v. Harrington, supra; State v. Kring, supra.*

This Court considered the question of a defendant's right to be free from physical restraints during his trial in *State v. Brewster,* 261 S.E.2d 77 (W. Va. 1979). The defendant in that case urged this Court to place the rule not favoring the use of physical restraints on the same constitutional footing as the rule prohibiting the appearance of the defendant in identifiable prison garb. We declined to do so: "There is a critical distinction between being forced to wear identifiable prison clothing and being forced to appear in physical restraints. The prison clothing serves no legitimate purpose, whereas physical restraints may be necessary in certain cases." *Id.* at 82. We held, however, that physical restraints should be used only after an evidentiary hearing on the question of whether such security measures are justified by the circumstances of the case. *Id.*

In the case presently before us the defendant was not compelled to appear for his trial in either prison clothing or in physical restraints. Rather, there was a deputy sheriff seated in close proximity to him at all times during the course of the trial. Defendant asks us to extend the holdings of *McMannis* and *Brewster* to this situation. This is a question of first impression in this jurisdiction and, although courts elsewhere have considered similar questions, no case directly on point has been found. A survey of similar cases from other jurisdictions do, however, reveal some generally applicable considerations.

We begin with the observation that no court, to our knowledge, has ever found the presence of security forces in a courtroom during trial to be prejudicial *per se*. The use of guards stationed in the courtroom during trial has traditionally been considered the method of security that least intrudes into the defendant's rights. In *Hall v. State*, 199 Ind. 592, 159 N.E. 420 (1928), the defendant was made to appear for his trial in shackles. In disapproving of the use of shackles the court said: "In the modern court-room, as little show of arms must be made as possible and ordinarily the necessary restraint can be accomplished by placing ununiformed guards near the prisoner." *Id.* at 601. Similarly, the Sixth Circuit has noted that the use of disguised guards is the method of security that least intrudes upon a defendant's due process rights and that method should, therefore, be preferred over physical restraints:

> [T]he use of guards for security purposes, when wisely employed, provides the best means for protecting a defendant's fair trial right and only in rare cases would greater security be warranted. Since guards can be strategically placed in the courtroom when more than normal security is needed and can be hidden in plainclothes, the jury never needs to be aware of the added protection so that no prejudice would adhere to the defendant.

*Kennedy v. Cardwell*, 487 F.2d 101, 108-109 (6th Cir. 1973).

Prejudice arising from the presence of guards in the courtroom is usually alleged to result from two possible

effects that such presence may have. The presence of the guards may, as is alleged in this case, lead the jury to infer that the defendant is a dangerous or untrustworthy man. *See Kennedy v. Cardwell, supra; McCloskey v. Boslow,* 349 F.2d 119 (4th Cir. 1965); *People v. Steel,* 52 Ill.2d 442, 288 N.E.2d 355 (1972).

The second manner in which prejudice may be alleged to occur from the presence of a guard stationed in the courtroom is illustrated by *Burwell v. Teets,* 245 F.2d 154 (9th Cir. 1957). In that case a guard was stationed in an anteroom out of the sight of the jury but visible to the defendant and other people present at the counsel table. The guard kept a loaded revolver in his hand at all times during the trial. The defendant alleged on appeal that the guard with the weapon made him tense and nervous and impaired his ability to participate in his own defense and to act as a witness on his own behalf.[5] In the case presently before us, the defendant mainly relies on the first basis of possible prejudice discussed above although there are suggestions in the record that defense counsel was concerned because the close proximity of the deputy may have interfered with the conduct of the defense.[6]

[5] The court rejected the defendant's argument because there was clear evidence that a violent escape attempt had been planned:
"It is too plain for argument that a prisoner who plans to shoot his way out of the courtroom is hardly in a position to complain about an armed guard stationed outside of the courtroom at the place where escape would most likely be attempted. We are of the opinion that no more safeguards were employed than were reasonably required in view of [the defendant's] own conduct."
245 F.2d at 167-168.

[6] Close proximity of a guard, however, has not generally been found to be a basis, by itself, for requiring reversal of a conviction. *See, e.g., Dorman v. United States,* 435 F.2d 385 (D.C. Cir. 1970) (U.S. Marshals stationed "right next to" the defendants); *United States v. Greenwell,* 418 F.2d 845 (4th Cir. 1969) (uniformed correctional officer seated inside the bar of the court). We can, however, envision a situation where locating a law enforcement officer in close proximity to the defense table at trial might raise problems under the Sixth Amendment of the *United States Constitution.* That problem is not presented by this case.

Few cases have considered the question of whether an evidentiary hearing should be held on the necessity of the placement of guards in a courtroom or the type of record that should be made so as to preserve the issue for appeal. The question of whether the use of guards in the courtroom to provide security was an abuse of the trial court's discretion was addressed in *United States v. Greenwell*, n. 6, *supra*; *Dorman v. United States*, n. 6, *supra*; and *Dennis v. Dees*, 278 F.Supp. 354 (E.D. La. 1968), but the courts, in those cases, did not address the question of whether an evidentiary hearing and record should be required.[7]

In *State v. Gore*, 257 S.C. 330, 185 S.E.2d 826 (1971), however, the trial judge did hold an evidentiary hearing on the necessity of placing guards in the courtroom during trial. The South Carolina Supreme Court commended the practice and, on the basis of the evidence taken at the hearing, held that the judge had not abused his discretion in allowing thirty-six law enforcement officers, two-thirds of whom were in uniform, to be placed in and around the courtroom during trial. Similarly, the Supreme Court of Indiana has noted that a record should be made of the evidence upon which a trial judge exercises his discretion in deciding what security measures are necessary so that his exercise of discretion may be reviewed on appeal. *Williams v. State*, 348 N.E.2d 623 (Ind. 1976).

An examination of the cases discussed above also reveals factors that should be considered by a trial judge in the

---

[7] *Dennis* represents the extreme in the use of guards as a security precaution at trial. That case was a federal habeas corpus action brought after the defendant had been convicted in state court of murdering a fellow inmate at the Louisiana State Penitentiary. At his murder trial in state court the defendant had been tried in shackles and prison garb. Additionally, during the trial, there were "many" guards armed with shotguns and automatic weapons stationed "possibly everywhere." The trial judge attempted to excuse the use of obviously excessive force by stating that it merely reflected the policy of the local Sheriff's office. The district court rejected that excuse as not being sufficient to justify the excessive show of force in the courtroom allowed by the trial judge and held that the trial judge's abuse of discretion had denied the defendant due process of law. 278 F.Supp. at 358.

exercise of his discretion on this question.[8] Mere reliance on the "policy" or judgment of local law enforcement officials is not sufficient justification. The discretion is the court's and must be exercised, not delegated. *See Dennis v. Dees, supra.* The Court should consider whether the defendant is in custody or free on bail at the time of the trial and the seriousness of the offense with which the defendant is charged. *See Williams v. State, supra.* The Court may also hear evidence as to the defendant's character, reputation for violence or evidence of other acts or crimes that would tend to indicate a danger which would justify the security precautions contemplated. *See State v. Gore, supra.* Evidence of prior escapes, attempted escapes, or present plans to escape are obviously relevant and are entitled to great weight should the court find the evidence credible. *Burwell v. Teets, supra.*

In exercising his discretion in this matter the trial judge must necessarily balance the interests of the defendant in a fair trial against the danger of escape or other danger to the public. A ruling permitting such security which appears to the trial judge to be reasonably necessary to prevent escape by the defendant, to assure orderly proceedings, or to protect the public, will not be reversed if it is based on a supportive record. We note that it is common practice in West Virginia to use uniformed guards in the courtroom. We do not think that such practice is *per se* error. In this case, however, the fact that the guard was seated near the defendant inside the bar of the court, and

---

[8] The American Bar Association standards on when the use of physical restraints are justified also point up some relevant considerations:

(1) [T]he seriousness of the present charge, (2) the person's character, (3) the person's past record, (4) past escapes by the person, (5) attempted escapes by the person, (6) evidence the person is planning an escape, (7) threats of harm to others, (8) threats to cause disturbance, (9) evidence that the person is bent upon self-destruction, (10) risk of mob violence, (11) risk of attempted revenge by victim's family, (12) other offenders still at large . . . .

A.B.A. Advisory Committee on the Criminal Trial, *Standards Relating to Trial by Jury,* 96, n. 9, (Approved Draft 1968).

may have had contact with the jury makes the security precaution more than that normally used in West Virginia. The ideal is the use of guards in plain clothes inconspicuously placed in the courtroom. *See Hall, supra; Kennedy, supra.* When this method is used, however, the court should take adequate precautions to prevent the identification of the guard to the jury.

The use of guards in a courtroom is similar to the use of physical restraints upon the person of the defendant in that both may interfere with his ability to participate in his own defense or lead to prejudicial inferences in the mind of the jury. Although the use of security precautions at a criminal trial is a matter which lies within the sound discretion of the trial judge, an evidentiary hearing should be held to determine whether the circumstances of a case justify greater than normal security precautions at trial. As in *State v. Brewster, supra,* however, the absence of such a record is not, *per se,* reversible error.

In so holding we emphasize that the use of security precautions at trial is a matter within the sound discretion of the trial judge. Our holding here is simply that it may be error to use more than the normal security precautions without "having developed an appropriate record to justify their use." *State v. Brewster, supra,* at 82. The record in this case is not adequate to determine whether the security precautions were reasonably necessary nor whether they prejudiced the defendant. The trial court should have held an evidentiary hearing as requested by defense counsel, especially in light of the allegation that the deputy had contact with the jury.

## IV. *THE MOTION TO SUPPRESS*

### A. *The Tires.*

At the defendant's trial the State sought to introduce into evidence the tires seized from the defendant's Ford LTD. The defense moved to suppress the tires as fruit of an illegal seizure. After an *in camera* hearing the trial court held that the seizure of the automobile had been incident to a lawful arrest and overruled the defense motion. On this appeal the defendant argues that admission of the tires

into evidence was error because the automobile was seized from private property without a warrant. The State counters that the trial court did not err in admitting the tires because the seizure of the automobile was justifiable and legal under the "plain view" and "exigent circumstances" exceptions to the Fourth Amendment warrant requirements. For the reasons hereinafter stated, we hold that, under the circumstances presented by this case, the trial court did not err in admitting the tires into evidence.

The United States Supreme Court has observed that "searches conducted outside the judicial process, without prior approval by a judge or magistrate are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).[9] It is also prudent, however, to bear in mind that Fourth Amendment jurisprudence is not a well-settled area of immutable rules; indeed, even the statement in *Katz v. United States, supra*, is subject to being questioned as being overbroad. As the Supreme Court said in *Coolidge v. New Hampshire*, 403 U.S. 443, 474-475, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971):

> "It is accepted, at least as a matter of principle, that a search or seizure *carried out on a suspect's premises* without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.' As to other kinds of intrusions, however, there has been disagreement about the basic rules to be applied. . . ."

(Emphasis added.)

---

[9] The Fourth Amendment to the *United States Constitution* provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Parallel language is found in Article III, Section 6 of the *West Virginia Constitution*.

Many exceptions to the warrant requirement have been recognized, labeled and cataloged by various courts.[10] While labels, such as "plain view," "hot pursuit," "automobile," etc., may be useful, they are not a substitute for analysis and reasoning. "Some cases fall between the categories. The labels do not always fit. Many decisions turn, not upon the labels, but upon a close analysis of the facts." *Carlton v. Estelle,* 480 F.2d 759, 761 (5th Cir. 1973). The decision in any one case must turn on the facts of that particular case examined in the light of the purposes served by the Fourth Amendment and the interests protected by that amendment.

The purpose of the Fourth Amendment's prohibition of warrantless searches and seizures is not the protection of property rights or interests so much as it is the protection of the "citizen from unwarranted intrusion into his privacy." *Jones v. United States,* 357 U.S. 493, 498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). *See also Warden v. Hayden,* n.10, *supra; Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). The Fourth Amendment protects "people, not places." *Katz v. United States, supra,* at 351. In order for a person to receive the protection of the Fourth Amendment he must have a reasonable expectation of privacy that has been invaded by official action.[11] *Katz v. United States,*

---

[10] See, e.g., Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (search incident to a lawful arrest); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stop and frisk); *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (hot pursuit); *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (plain view); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (automobiles); *United States v. Colbert,* 474 F.2d 174 (5th Cir. 1973) (abandonment). In Syl. pt. 5, *State v. Craft,* 272 S.E.2d 46 (W.Va. 1980), we recognized an additional exception to the prohibition against warrantless seizures when we said: "Under certain circumstances, when the occupants of an automobile have been arrested police officers may take the automobile into custody for public safety purposes, or in order to protect the vehicle from vandalism or damage, or to protect the owner's personal property that may be left in the vehicle."

[11] Justice Harlan, in his concurring opinion in *Katz v. United States, supra,* at 361, said, "My understanding of the rule that has emerged from prior decisions is that there is a two-fold requirement, first that

*supra.* The Fourth Amendment of the *United States Constitution,* and Article III, Section 6, of the *West Virginia Constitution* protect a person's reasonable expectation of privacy. The fact that some warrantless actions by the police do not amount to a substantial invasion of a defendant's reasonable expectation of privacy is the basis upon which some of the exceptions to the warrant requirement have been built.

A distinction has long been recognized between the warrantless search or seizure of an automobile and the search of a home or office because the Fourth Amendment protects reasonable expectations of privacy.[12]

a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'." *See also Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

[12] The second reason usually given for treating automobiles differently is that they are highly mobile and "the opportunity to search is fleeting since the car is readily movable." *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). "This is strikingly true where the automobile's owner is alerted to police intentions and, as a consequence, the motivation to remove evidence from official grasp is heightened." *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). Some courts have read *Chambers* to mean that the mobility of a vehicle is an exigent circumstance that may justify its warrantless search or seizure even in the absence of a likelihood of loss of evidence or movement of the vehicle. *See United States v. Finnegan,* 568 F.2d 637 (9th Cir. 1977); *United States v. Bertucci,* 532 F.2d 1144 (7th Cir. 1976); *United States v. Walton,* 538 F.2d 1348 (8th Cir.), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 647, 50 L.Ed.2d 628 (1976); *United States v. McClain,* 531 F.2d 431 (9th Cir. 1976); *Rickman v. State,* 361 So.2d 28 (Ala. 1978); *State v. Million,* 583 P.2d 897 (Ariz. 1978); *State v. Hunt,* 577 P.2d 717 (Ariz. 1978); *People v. Clark,* 408 N.Y.S.2d 463, 380 N.E.2d 290 (1978); *State v. Jones,* 245 S.E.2d 711 (N.C. 1978); *State v. Mathis,* 247 S.E.2d 919 (N.C. 1978); *Thompson v. State,* 265 N.W.2d 467 (Wis. 1978). Other courts still require a particular showing of exigent circumstances and consider the mobility of the vehicle as one of the factors to be considered. *See United States v. Jamerson,* 549 F.2d 1263 (9th Cir. 1977); *United States v. Farnkoff,* 535 F.2d 661 (1st Cir. 1976); *United States v. Robinson,* 533 F.2d 578 (D.C. Cir. 1976); *United States v. Bradshaw,* 490 F.2d 1097 (4th Cir.), *cert. denied,* 419 U.S. 895 (1974); *Clark v. State,* 574 P.2d 1261 (Alas. 1978); *State v. Miles,* 545 P.2d 484 (Idaho 1976); *Gaddis v. State,* 368 N.E.2d 244 (Ind. 1977); *State v. Guzman,* 362 So.2d 744 (La. 1978); and *State v. Navarro,* 312 So.2d 848 (La. 1975). In *State v. Moore,* 272 S.E.2d 804 (W.

"One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view.... This is not to say that no part of the interior of an automobile has Fourth Amendment protection; the exercise of a desire to be mobile does not, of course, waive one's right to be free of unreasonable government intrusion. But insofar as Fourth Amendment protection extends to a motor vehicle, it is the right to privacy that is the touchstone of our inquiry."

*Cardwell v. Lewis*, n. 12, *supra*, at 590-591.[13]

It is against this background that the facts of this case must be analyzed. The defendant does not assert that the police did not have probable cause to seize the automobile or to be on the defendant's mother's property at the time the seizure took place. He merely argues that a warrantless seizure of an automobile located on private property at the time of the seizure cannot be justified absent exigent circumstances and asserts that there are no such exigencies in this case.

In ruling on this assignment of error it is necessary that the issue presented be narrowly framed and understood. The defendant claims that the seizure of his automobile from his mother's property was illegal and, therefore, the tires were tainted evidence that should have been suppressed. A question presented here then is when can the police seize an automobile located on a third person's property in the absence of a warrant. The more narrow and

Va. 1980), we made it clear that the mobility of an automobile is not enough, by itself, to justify a warrantless search and seizure in this jurisdiction.

[13] *See also Coolidge v. New Hampshire, supra,* at 461, where the United States Supreme Court said: "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." A warrantless search of an automobile must be reasonable in light of the diminished expectation of privacy that a person may have in his automobile as weighed against any exigent circumstances that may exist in a particular case.

dispositive question, however, is what exigent circumstances will justify a warrantless seizure of an automobile located on the property of a third party. There is no talisman or one deciding factor in making this determination. Rather, the question must be analyzed in light of all circumstances to determine whether the seizure was reasonable. Without deciding the outer limits of such justifying circumstances, we think that, upon the facts of the case presently before us, there were exigent circumstances sufficient to justify the action taken by the State Police in this case.

In making his argument the defendant relies primarily upon three cases: *United States v. Bradshaw*, 490 F.2d 1097 (4th Cir.), *cert. denied*, 419 U.S. 895 (1974); *United States v. McCormick*, 502 F.2d 281 (9th Cir. 1974); and *State v. Sauve*, 544 P.2d 1091 (Ariz. 1976). The reliance is misplaced as those cases are factually distinguishable from the case presently before us. The automobile here was not located on the defendant's property at the time of the seizure but, rather, on the property of a third party. There was, in this case, an "alerted criminal bent on flight." *Coolidge v. New Hampshire, supra*, at 462. The suspect was still at large at the time of the seizure—there was "a criminal suspect close enough to an automobile to procure a weapon, or destroy evidence within it . . . ." *Nolan v. State*, 588 S.W.2d 777 (Tenn. Cr. App. 1979).[14] The defendant's girlfriend and mother were in close proximity to the car and the troopers knew that the girlfriend had been in control of the car. A special detail to guard the car would have been a serious inconvenience here in light of the fact that there was an ongoing search for a suspect in a brutal murder whom the troopers could reasonably have believed to be armed and dangerous and in the area. The troopers did not have

---

[14] *See also Coolidge v. New Hampshire, supra*, at 461, n. 18, where the United States Supreme Court, in discussing the automobile exception to the warrant requirement and its finding that the exception did not apply in that case due to absence of exigent circumstances related to the automobile, noted: "Of course, if there is a criminal suspect close enough to the automobile so that he might get a weapon from it or destroy evidence within it the police may make a search of appropriately limited scope."

significant prior notice as to the identity of the car or its use for an illegal purpose. The troopers could also have reasonably believed that the car, at the time of the seizure, was being presently used for an illegal purpose, i.e., the attempted flight of a felon. Discovery of the car was inadvertent in that the troopers did not have to take any positive action to bring it into view nor did they know its location in advance. They did not form a prior intent to seize the car. These factors were not present in the cases cited by the defendant.[15] *Cf. People v. O'Brien*, 282 N.W.2d 190 (Mich. App. 1979).

The Fourth Amendment protects A person's reasonable expectation of privacy. A person's expectation of privacy in his automobile is less than that which he would have in his

---

[15] Also of some significance is the fact that, in all three cases cited by the defendant, the evidence sought to be introduced by the government was seized from the interior of the vehicle. In *McCormick* it was a photographic negative of a treasury seal that was found when the interior of the car was searched. In *Bradshaw* it was moonshine whiskey that had been seized from the interior of an enclosed truck. In *Suave* it was contraband from a burglary that had been seized from the interior of a car. The police in this case did remove two shotguns from the trunk of the car but those weapons were unrelated to this case and no attempt was made to introduce them into evidence at the defendant's trial. The only evidence resulting from the seizure of the automobile used at trial were the rear tires removed from the car. The defendant does not object to the "search" of the car subsequent to its seizure. His objection is that the seizure of the car itself without a warrant while it was located on his mother's property was illegal and that the tires were, therefore, tainted evidence. Remembering that the touchstone of an inquiry such as the one here is the defendant's reasonable expectation of privacy, we think that it would be hard to say that the Fourth Amendment protects a person from visual inspection of the exterior of his car in circumstances such as those found in this case. "With the 'search' limited to the examination of the tire on the wheel . . . we fail to comprehend what expectation of privacy was infringed . . . . Under circumstances such as these, where probable cause exists, a warrantless examination of the exterior of a car is not unreasonable under the Fourth and Fourteenth Amendments." *Cardwell v. Lewis*, n.12, *supra*, at 591-592. Similarly the Minnesota Supreme Court has noted that the "defendant certainly had no expectation of privacy in the exterior of the vehicle . . . ." *State v. Roy*, 265 N.W.2d 663, 665 (Minn. 1978).

home or his place of business.[16] The expectation of privacy associated with the exterior aspects of an automobile is even less than that associated with the interior portions.[17] And, where the automobile is parked on a third person's property and the automobile is open to view from a public highway, any possible expectation of privacy in the exterior aspects of the automobile is even further diminished. *See*, n.15, *supra.*

In the case presently before us we think that the defendant, at the time of the seizure, had little, if any, reasonable expectation of privacy in the exterior of his car. He had fled the vehicle shortly before the seizure. Even before that he had turned control of the vehicle over to a third party, Donna Fraley. He knew, as his flight demonstrated, that he was sought by the police and it is likely under the circumstances that he also knew that the police would be searching for his car. The car was parked on the property of a third party after being left in the possession and control of another party.

Against this negligible expectation of privacy we must weigh the circumstances which could possibly justify the action taken by the police. We think that it is clear that there were sufficient compelling circumstances in this case to overcome any possible expectation of privacy that the defendant may have had, reasonable or otherwise.

In general, the totality of the circumstances justified the troopers' belief that an offense had been committed and

---

[16] *See Chambers v. Maroney,* n.12, *supra,* at 52, where the United States Supreme Court said: "[F]or the purposes of the Fourth Amendment there is a constitutional difference between houses and cars."

[17] *See, Cardwell v. Lewis,* n. 12, *supra,* at 593, where Justice Blackmun wrote:

*Coolidge* concerned a thorough and extensive search of the entire automobile including the interior from which, by vacuum sweepings, incriminating evidence was obtained. A search of that kind raises different and additional considerations not present in the examination of a tire on an operative wheel and in the taking of exterior paint samples from the vehicle in the present case for which there was no reasonable expectation of privacy.

*See also State v. Roy,* n.15, *supra.*

that the car was evidence connected with that offense. More specifically there were compelling exigent circumstances present. The suspect, reasonably believed to be armed, dangerous, and fleeing, was at large in the area where the car was found.[18] The defendant's mother and girlfriend were also in the area and the troopers could have reasonably feared that they might tamper with the automobile or seek to remove it or to remove evidence from it. Such an apprehension was especially justifiable in light of the girlfriend's actions when first questioned by the troopers. Her earlier misleading statements about her knowledge as to the defendant's whereabouts could justifiably have led the troopers to believe that she was trying to aid in the defendant's escape attempt and that she might take other action to aid him.[19] Under these circumstances the troopers' action of immediately seizing the car, instead of securing it by placing a guard on it while other troopers sought a warrant, was not unreasonable. The immediate seizure of the car allowed the troopers to concentrate their resources and efforts on the quick apprehension of the suspect. At this point in the search the pursuit was hot and the troopers' decision to concentrate their resources on that pursuit was not unreasonable. Thus, it is clear that the troopers were justified in seizing the car on the spot.

The exigent circumstances found in this particular case justify the warrantless incursion by the police into the defendant's diminished expectation of privacy in the exterior of his automobile. The trial court, therefore, did not err in admitting the tires into evidence.

[18] For cases where a finding of exigent circumstances was based on the fact that the suspect was unapprehended at the time of the seizure of the vehicle *see United States v. Helberg,* 565 F.2d 993 (8th Cir. 1977); *United States v. Farnkoff,* 535 F.2d 661 (1st Cir. 1976); and, *Commonwealth v. Ortiz,* 380 N.E.2d 669 (Mass. 1978).

[19] Other courts have found exigent circumstances based on similar facts. *See United States v. McClain,* n.12, *supra; United States v. Evans,* 481 F.2d 990 (9th Cir. 1973); *England v. State,* 334 A.2d 98 (Md. 1975); and, *People v. O'Brian, supra.*

## B. *The Trailer.*

Prior to his trial the defendant also moved to suppress the evidence seized from his trailer by the police.[20] The trial court overruled the motion to suppress, holding that the troopers' first entry into the defendant's trailer without a warrant was a lawful entry made in order to effect the arrest of the defendant while the police were in hot pursuit.

On this appeal the defendant argues that the first entry into the trailer was illegal and that all of the evidence seized under the subsequently issued warrant should be suppressed because probable cause for issuance of the warrant was based on the prior illegal entry. The State responds that the first warrantless entry into the defendant's residence was legal and justified by exigent circumstances. The State also argues that, even if the first entry was illegal, the admission of the evidence subsequently seized when the search warrant was executed was proper because the warrant was validly issued under the independent source rule.

The law on warrantless entries of a dwelling to effectuate an arrest is well settled in West Virginia: In the absence of one of the exemptions to the warrant requirement, the police must obtain an arrest warrant before entering a home to seize a person. *State v. McNeal,* 251 S.E.2d 484 (W. Va. 1978). *See also Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). There can be little doubt that the warrantless entry in the case presently before us does not fall into one of those exceptions.

---

[20] At trial the State offered into evidence the following property stolen from the Moreland residence and subsequently found in Peacher's trailer: a television set, a sewing machine, end tables and coffee tables, two shotguns, a pistol, and several lamps. The State also offered an order form for shoes, addressed to Mr. Moreland, that had been found in a drawer of one of the stolen tables seized at the defendant's residence. The items of furniture and the weapons were observed by the police upon their initial entry into the trailer without a warrant but were not seized until the search warrant was executed later that night. In executing the warrant the police found an additional piece of evidence used at trial—a blue plaid shirt which a deputy sheriff discovered in a trash can. The shirt had been overlooked in the first cursory search of the defendant's trailer.

The record indicates that the troopers had no solid indication that the suspect was in the trailer. The trail that had been hot earlier in the afternoon had by this point grown cold. Indeed, the troopers had gone back to a general search because they had lost his trail.[21]

The troopers' justification for the entry—to effectuate the arrest of the defendant—is belied by their own testimony as to the manner of entry into the trailer. We find it hard to believe that a trained professional law enforcement officer would allow himself to be pushed through a small window, unarmed, if he actually believed that there was even a remote possibility that he would find himself face to face with an armed and dangerous person suspected of recently committing a brutal murder. Under the circumstances of this case the troopers' entry of the trailer was without legal justification. Nonetheless, we find merit in the argument that the admission of the evidence was proper because the search warrant was validly issued under the independent source rule.

The best statement of the independent source rule, as it applies to the issuance of a search warrant, is found in *United States v. Giordano*, 416 U.S. 505, 554-556, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974):

> The independent source rule has as much vitality in the context of a search warrant as in any other. Thus, for example, unlawfully discovered facts may serve as the basis for a valid search warrant if knowledge of them is obtained from an independent and lawful source. (Citation omitted.) The obvious and well-established corollary is that the inclusion in an affidavit of indisputably tainted allegations does not necessarily render the resulting warrant invalid. The ultimate inquiry on a

---

[21] As in *State v. McNeal, supra,* no one had seen the defendant enter the premises. The police stated that they believed him to be there because the air conditioner was running and the door was locked—ambiguous indicators at best. The admitted that they had no other indications that the suspect was in the trailer. One trooper, Sergeant Smith, testified at the *in camera* hearing held on the defendant's motion to suppress the evidence that the entry into the trailer was made because "it was the last place to look."

motion to suppress evidence seized pursuant to a warrant is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause.

*Accord United States v. DiMuro*, 540 F.2d 503 (1st Cir. 1976); *United States v. Pike*, 523 F.2d 734 (5th Cir. 1975); *United States v. Capra*, 501 F.2d 267 (2nd Cir. 1974); *United States v. Hunt*, 496 F.2d 888 (5th Cir. 1974); *United States v. Koonce*, 485 F.2d 374 (8th Cir. 1973); *United States v. Tarrant*, 460 F.2d 701 (5th Cir. 1972); *Howell v. Cupp*, 427 F.2d 36 (9th Cir. 1970); *James v. United States*, 418 F.2d 1150 (D.C. Cir. 1969); *United States v. Sterling*, 369 F.2d 799 (3rd Cir. 1966); *Chin Kay v. United States*, 311 F.2d 317 (9th Cir. 1962); *United States v. Jankowski*, 470 F.Supp. 464 (W.D. Pa. 1979); *United States v. Epstein*, 240 F.Supp. 80 (S.D. N.Y. 1965); *People v. Barndt*, 604 P.2d 1173 (Colo. 1980); *Neary v. State*, 384 So.2d 881 (Fla. 1980); *Commonwealth v. Cosby*, 234 Pa. Super. 1, 335 A.2d 531 (1975); *Commonwealth v. Thomas*, 444 Pa. 436, 282 A.2d 693 (1971).

The test for measuring the sufficiency of an affidavit which contains both lawfully and unlawfully obtained information was stated in *James v. United States, supra,* at 1151-1152:

> ... [T]he validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue .... If the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant, apart from the tainted information, the evidence seized pursuant to the warrant is admitted.

Applying that test to the facts of the case before us we believe that, even with exclusion of the information in the application for the warrant that was derived from the illegal entry, there were sufficient facts stated in Corporal Johnson's affidavit upon which an impartial magistrate could have found probable cause. Those facts were: (1) the occurrence of the burglary and murder; (2) Constable

Giardina's information; (3) the tire tracks found at the scene of the crime; (4) the discovery of tires with similar tracks on the defendant's car; and (5) the piece of wood veneer which was found behind the defendant's trailer and matched to the stereo left at the Moreland residence. We hold, therefore, that the search warrant was validly issued and executed as it was based on information, apart from that gained by the illegal entry, that could have led a reasonably prudent and impartial magistrate to believe that there was probable cause to believe that evidence of the crime would be found in the trailer.

In this case all of the independent evidence upon which a finding of probable cause could have been based was discovered prior to the illegal entry and none of it was discovered as a result of police illegality.[22] *See Weaver v.*

---

[22] The recent case of *State v. Stone,* 268 S.E.2d 50 (W.Va. 1980) is distinguishable on that basis. In *Stone* the facts upon which the search warrant issued had all been illegally obtained prior to the issuance of the warrant. The independent source rule, therefore, was not in issue in that case. We did, however, say:

[P]roperty observed during an illegal or improper search cannot be subsequently seized pursuant to a lawful search warrant which was based upon the illegally observed evidence. This is not to say that this evidence is forever barred, for if information pertaining to the stolen property can be lawfully obtained, then a proper search and seizure could be accomplished.

*Id.* at 54. The point was emphasized in the second syllabus point of *Stone* where we said:

Property observed during an illegal search cannot be subsequently seized pursuant to a lawful search warrant which was based *solely* upon observations made during the illegal search.

(Emphasis added.)

This case does not present a situation where the independent source is discovered after the initial illegality. *See, e.g., United States v. Friedland,* 441 F.2d 855 (2nd Cir. 1977); *United States v. Bacall,* 443 F.2d 1050 (9th Cir. 1971); *United States v. Giglio,* 263 F.2d 410 (2nd Cir. 1959); *United States v. Sheba Bracelets,* 248 F.2d 134 (2nd Circ. 1957); *Gregory v. United States,* 231 F.2d 258 (D.C. Cir, 1956).

Where the independent source is only discovered after the initial illegality close analysis is required to assure that the source is indeed independent and not a fruit of the prior illegality. We do not address that question as it is clear that on the facts in this case that the independent source existed prior to the unconstitutional search and did not result from any illegal activity on the part of the police

*United States*, 374 F.2d 878 (5th Cir. 1967); *United States v. Barrow*, 363 F.2d 62 (3rd Cir. 1966); *Hollingsworth v. United States*, 321 F.2d 342 (10th Cir. 1963); *Commonwealth v. Davenport*, 462 Pa. 543, 342 A.2d 67 (1975). An affidavit in support of an application for a search warrant which contains information that antedates, and is totally independent of, information learned from an unconstitutional search, as well as information from the unconstitutional search, may still be the basis upon which a valid search warrant may issue, if the information in the affidavit, excluding that information attributable to the unconstitutional search, is sufficient to justify a finding of probable cause.

The defendant, on this appeal, especially argues that the admission of the blue plaid shirt seized at his trailer was error. He makes this argument on the basis of the fact that the shirt was essential to various identification testimony and that its introduction "may have been a crucial piece of evidence weighed by the jury in deciding to return a verdict of guilty of first degree murder without a recommendation of mercy." The shirt was not observed during the first illegal entry of defendant's trailer but was found in a trash can inside the defendant's trailer by a deputy sheriff upon the execution of the search warrant. The defendant, in his brief, admits that the shirt "was found during the course of the second search by Deputy Sheriff Mills." Other than the alleged prejudicial effect of the shirt, no ground is assigned other than the general objection to the search of the trailer for excluding it from evidence. The fact that evidence is prejudicial is not grounds by itself for exclusion. It is safe to say that almost all evidence introduced by the State in a criminal trial is prejudicial in one degree or another; indeed, that is usually why it is introduced. If the

---

conducting the investigation. Our holding here is limited to those situations where the source is known prior to the illegal action. The mechanics of the independent source rule in situations where the illegal activity predates discovery of the independent information is not raised by this case.

prejudice caused by the evidence, however, outweighs the probative value of the evidence, it should be excluded. *See generally State v. Demastus,* 270 S.E.2d 649 (W. Va. (1980). That is not the case here. The shirt was seized pursuant to a valid warrant and was properly admitted into evidence.[23]

## D. *The Arrest.*

The defendant also objected to the court ruling that allowed the watch and bandana seized at the time of the defendant's arrest to be admitted into evidence at trial. The defendant, on this appeal, argues that the evidence should have been suppressed because the arrest of the defendant occurred when Trooper Bradley stopped the defendant with his drawn gun, at which time, it is alleged, the trooper did not have probable cause to arrest the

---

[23] Although the defendant does not raise the point, we note that the shirt was properly seized even though it was not listed as an item to be searched for in the search warrant. It is generally well settled that the police can seize evidence of a crime which is discovered in the physical area properly searchable and within the purposes for which the search is initiated even though the warrant does not sepcifically list the item seized, provided that the search is lawful. *See, e.g., Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *Harris v. United States,* 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); *United States v. Kane,* 450 F.2d 77, (5th Cir.) *cert. denied,* 405 U.S. 934, 92 S.Ct. 954, 30 L.Ed.2d 810 (1971); *United States v. Chadwell,* 427 F.Supp. 692 (D. Del. 1977); *United States ex rel. Myles v. Twomey,* 352 F.Supp. 180 (N.D. Ill. 1973); *United States v. White,* 122 F.Supp. 664 (D. D.C. 1954); *State v. Scigliano,* 120 Ariz. 6, 583 P.2d 893 (1978); *Harp v. State,* 136 Ga.App. 897, 222 S.E.2d 623 (1975); *State v. Gilbert,* 354 So.2d 508 (La. 1978); *Commonwealth v. DeMasi,* 362 Mass. 53, 283 N.E.2d 845 (1972); *Commonwealth v. Fields,* 2 Mass.App. 679, 319 N.E.2d 461 (1974); *State v. Cernohous,* 295 Minn. 491, 205 N.W.2d 680 (1973); *State v. Kook,* 14 Or.App. 594, 513 P.2d 1189 (1973); *State v. Van Beek,* 88 S.D. 154, 216 N.W.2d 561 (1974); *State v. Helmka,* 86 Wash.2d 91, 542 P.2d 115 (1975); *Myers v. State,* 60 Wis.2d 248, 208 N.W.2d 311 (1973). In this case the warrant under which the shirt was seized was valid. The warrant specified items of such a size and nature that could have been located in the trash can and, therefore, it was not beyond the scope of the warrant for the police to look into the trash can. The officers also had enough information from the prior investigation to warrant a belief that the shirt was evidence connected to the crime under investigation.

defendant and, therefore, the evidence was not seized in a search incident to a lawful arrest. We find no merit in the argument.

The defendant recognizes that a police officer may use reasonable force to make an investigatory stop when confronted with suspicious circumstances. His sole argument here is that Trooper Bradley's use of a drawn gun in effectuating the stop converted it to an arrest at that point.

The use of a drawn gun by a police officer in making an investigatory stop of a suspected criminal under suspicious circumstances is not enough, by itself, to convert the investigatory stop to an arrest which would require probable cause at that point. *United States v. Maslanka*, 501 F.2d 208 (5th Cir. 1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975); *United States v. Bull*, 565 F.2d 869 (4th Cir. 1977). The main case upon which the defendant relies in making his argument, *United States v. Strickler*, 490 F.2d 378 (9th Cir. 1974), was distinguished in *Maslanka*. In *Strickler* the police surrounded the defendant's parked car with three police cars and immediately pointed their guns at the defendant and told him to raise his hands. At that time they did not have probable cause to believe that the defendant was committing the crime, or had committed the crime, with which he was subsequently charged. In *Maslanka* a lone police officer on an open highway had just stopped the defendant's car after a high speed chase. The court in *Maslanka* held that there was probable cause for the arrest regardless of when the seizure of the defendant first occurred. The Fifth Circuit did, however, note:

> [The officer] was under a duty to investigate the situation. By drawing his revolver as he approached the Cadillac it may reasonably be contended that he was exhibiting proper caution under the circumstances. It does not seem to us that, without regard to motive, solely because an officer draws his weapon, an investigatory stop is turned into an arrest. To require an officer to risk his life in order to make an investigatory stop

would run contrary to the intent of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

501 F.2d at 213, n.10.[24]

The standard of evaluation in cases such as this was stated in *United States v. Bull, supra,* at 870-871:

> The one circumstance on which the defendant relies for his contention that the action of the officer constituted an arrest was the use of his gun when he accosted the defendant.
>
> This fact, standing alone, however, is not sufficient to constitute the action of the officer as an arrest; it is but one circumstance, along with all others surrounding the incident, to be weighed in determining the character of the officer's action .... Among the circumstances to be considered with this issue are the "characteristics of the area" where the stop occurs, the time of the stop, whether late at night or not, as well as any suspicious conduct of the person accosted such as an obvious attempt to avoid officers or any nervous conduct on the discovery of their presence.

*See also Terry v. Ohio, supra,* at 9, where it was pointed out that the question posed in that case was "whether in all *the circumstances* of this on-the-street encounter, his [the

---

[24] *See Terry v. Ohio, supra,* at 23-24, where Chief Justice Warren observed:

Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded .... In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to ... neutralize the threat of physical harm.

defendant's] right to personal security was violated by an unreasonable search and seizure." (Emphasis added.)[25]

We think that the case now before us clearly falls into that category of cases where, under all the circumstances, a drawn gun does not by itself convert the stop into an arrest. Trooper Bradley's use of his weapon to make the stop was not unreasonable under all the circumstances found here. The case is not like that of *United States v. Strickler, supra,* where the defendant was surrounded by an overwhelming police force on a public roadway in broad daylight while sitting peaceably in his car. It is more like the cases found in *United States v. Maslanka, supra,* and *United States v. Bull, supra.* It was late at night. A suspect was fleeing. The area where the chase occurred was evidently residential in nature and the suspect was caught at the back of someone else's home. The trooper's foresight in having his weapon ready was not unreasonable under these facts. Indeed, it may well have been unreasonable had Trooper Bradley not taken that rudimentary precaution towards protecting himself and other innocent parties who may have been in the area.

The stop of the suspect, under the circumstances of this case, was reasonable.[26] Trooper Bradley's use of his weapon in stopping the suspect did not make the stop

---

[25] *See Terry v. Ohio, supra,* at 19 and 21-22:

[T]he central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security . . . . And in making that assessment it is imperative that the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?

[26] *See Adams v. Williams,* 407 U.S. 143, 145-146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972):

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape . . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

unreasonable. It follows, therefore, that an arrest did not occur until after the defendant had identified himself. At that point it is clear that the troopers did have probable cause[27] upon which to base an arrest.[28] The subsequent search, therefore, was valid and the watch and bandana were properly admitted into evidence.

The judgment of the Circuit Court of Jefferson County is reversed and the case is remanded for further proceedings in accordance with the principles set forth in this opinion because the trial judge abused his discretion in limiting the scope of *voir dire* in derogation of the defendant's due process rights. *See* Section II, B, *supra*.

Reversed and
Remanded.

[27] In Syl. pt. 1, *State v. Plantz*, 155 W.Va. 24, 180 S.E.2d 614 (1971), we said: "Probable cause to make an arrest without a warrant exists when the facts and the circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been committed." Probable cause existed in this case. Trooper Kimble had been involved in the investigation from an early stage and was aware of most of the results of the investigation which provided the basis for probable cause to believe that Peacher was the perpetrator of the crime. Trooper Bradley also testified that he believed that an arrest warrant had been issued or was in the process of being issued. *See Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). These facts were sufficient to justify a prudent person in believing that the suspect had committed a crime.

[28] Under the facts here presented an arrest warrant was not necessary. *See State v. Craft*, 272 S.E.2d 46, 54 (W.Va. 1980), where we said: "There is little question that the right to arrest in public without a warrant, based on probable cause that the person has or is about to commit a felony, is the general if not universal rule in this country." *See also* Syl. pt. 2, *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973).